Danny Lee GLASS, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 92–165.

Supreme Court of Wyoming.

June 4, 1993.

Leonard D. Munker, State Public Defender, Dave Gosar, Asst. Public Defender, Gerald M. Gallivan, Defender Aid Program, and Dion Custis, Student Intern, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., Theodore E. Lauer, Director of the Prosecution Assistance Program, and Carmen L. Patterson and Chuck Solomon, Student Interns, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

MACY, Chief Justice.

Appellant Danny Lee Glass appeals from his conviction for misdemeanor larceny in violation of Wyo.Stat. § 6–3–402(a) and (c)(iii) (1988).

We affirm.

Appellant predicates his appeal upon this abstract of the issues:

I. Did the trial court err in not suppressing statements, actions, and evidence which were the product of an illegal arrest.

    A. Are nighttime, nonconsensual, nonexigent, warrantless arrests per se unconstitutional under the 4th Amendment of the U.S. Constitution and Article 1, Section 4 of the Wyoming State Constitution?

1. Does a ward of the state have an expectation of privacy while residing in a halfway house?

2. Was the officers' entry nonconsensual?

3. Was there a lack of exigent circumstances to justify a nighttime, nonconsensual, and warrantless entry into the defendant's home?

4. Was the defendant placed under "custodial arrest"?

B. Did the trial court err in admitting statements and evidence resulting from an illegal arrest?

II. Did the trial court err in allowing defendant's statement and actions, which were the result of an involuntary waiver of *Miranda* warnings in violation of the 5th and 14th Amendments of the U.S. Constitution and Article 1, Section[s] 6 and 11 of the Wyoming State Constitution?

The facts relevant to the resolution of this appeal were developed at a hearing held upon Appellant's motion to suppress statements he made before, during, and after his arrest, as well as evidence gathered by the State as a product of those statements. During the afternoon of December 4, 1991, a Campbell County sheriff's officer observed a winch in the back of a pickup parked near Community Alternatives of Gillette. Community Alternatives is a community-based corrections facility, and Appellant was serving part of a four- to six-year penitentiary sentence at the center. The officer was aware that, within the past several days, such a winch had been reported as being stolen. At about ten o'clock that evening, this information was passed on to the officers who were to work the night shift of December 4–5, 1991, and they were asked to check further into the matter. Those officers were not able to do so until about three o'clock in the morning on December 5, 1991. At that time, they determined that the winch matched the description of the stolen winch and that the pickup in which it was discovered belonged to Appellant. Surmising that Appellant resided at Community Alternatives, the officers went into the building to locate him and to inquire about the winch. They established which was Appellant's room from a sign-up sheet for a wake-up call.

At about 3:20 a.m., the officers went to the room, and, after at least two knocks, Appellant answered the door. Appellant was clad in his underwear and apparently had been asleep. He left the door open and retired to his bed, covering himself with a sheet. The officers followed him into the room and, in quick succession, asked him if he was Dan Glass and if he owned the

pickup containing the winch. Appellant answered both questions, confirming his identity and ownership of the pickup and "most" of its contents. The officers proceeded to ask additional questions, and Appellant admitted that he had stolen the winch, using tools which were located in his pickup. The officers placed Appellant under arrest at 3:37 a.m. and gave the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). They testified that they had not considered Appellant as being under arrest until that moment in the encounter and that, if Appellant had asked them to leave at any time earlier, they would have done so. After giving the *Miranda* warnings, the officers asked Appellant to get dressed. They asked Appellant what shoes he was wearing on the night he stole the winch. Appellant pointed to a pair of western-style boots which could have produced the boot prints which were found in fresh snow at the crime scene. The officers instructed Appellant to wear those boots, and eventually the boots were seized and admitted into evidence. Because Appellant indicated in his confessional statement that he stole the winch for someone from Newcastle, the officers asked him to cooperate in making a telephone call to that individual for the purpose of implicating him in the crime. Appellant said that he would need to speak to a lawyer before assisting the officers. Once he was outside the Community Alternatives building, and after being specifically instructed that he was under arrest and that he did not have to answer any additional questions, Appellant pointed out the wire cutters and wrench he had used in stealing the winch. The next day, a warrant was obtained for the seizure of the winch and the tools.

At the conclusion of the suppression hearing, the district court rendered its decision:

The problem I have with this case is the problem of custodial interrogation within the meaning of Miranda, and the officer merely saying someone was not under arrest is not sufficient if the facts

and circumstances then present suggest that contrary is true.

In this instance I'm sure the testimony is accurate that the defendant was not under arrest when the officers went into his room. And I notice that Deputy Seeman in response to the question, "Would you have left if he'd asked you to leave?" said, "I would have left the room." I think the implication from that is pretty clear that he may have left the room, but Mr. Glass was not going to go anywhere.

At some point in time that interrogation in the room, I think, turned into custodial interrogation. When the officer went to the room he had, I think, good cause to believe that Mr. Glass was the one who had stolen the winch. It had been recently stolen. It was in the back of a pickup which was registered to him. I think as a matter of caution it was prudent for the officer upon going into the room to make sure that, in fact, the vehicle did belong to Mr. Glass and that there wasn't some kind of a clerical mix up and that Mr. Glass had the property in it.

So all those questions that went to Mr. Glass—about whether he owned the pickup, or whether that was his pickup, whether he owned the property in the pickup—I believe were merely—were questions that just merely meant to confirm some of the things which appeared from the record to be true.

Once that was done, however, I think the officer knew that—or certainly had good cause to know that Mr. Glass is the one who had stolen the winch. To go further with the questioning without Miranda warnings is improper.

While Mr. Glass may not have been under arrest at that moment, it seems to me quite evident that had Mr. Glass tried to leave he would have been placed under arrest. So the statements made by Mr. Glass after his statement that he owned the pickup and that the property in the pickup belonged to him are suppressed up until the time of any statements made after he was advised of his rights per Miranda.

And I specifically find that he was advised per Miranda, that he requested to talk to a lawyer, and that request was honored by the officer, and that after having made that request, upon his own initiative that the defendant offered keys to the car or the keys to the pickup and showed the officer where the pliers w[ere]. So that evidence is not suppressed, because it was volunteered by the defendant without any pressure at all from the officers and while he was under arrest legally and after having been advised per Miranda and having elected to have a lawyer.

The testimony of one of the officers in this regard is helpful to a resolution of these issues:

A At that point I handcuffed him, escorted him out the building to the area of the truck where Deputy Prell was there watching the truck. At that point Glass was handcuffed. He was wearing his jacket. He told me to take the truck keys out of his pocket and then he'd show me where the wire cutters were.

Q Let me stop you right there. Did you ask him to do that?

A No, we had discussed this previously when—before he was arrested when I asked him if the wire cutters were still in the truck, and he said he wasn't sure, but he'd show me. And so while we were walking out he said, yeah, the keys—the way he did it, he indicated with his head down to his right-hand pocket. He said keys are in the pocket here, and at that point I stopped him. I told him, you know, that you don't have to show me where these wire cutters are. You're under arrest. You don't have to show me where they are. He said that's okay.

I took the keys out of his pocket. He indicated that the wire cutters would be inside a toolbox located in the bed of the truck right behind the cab. I got up inside the bed of the truck. I took the keys. The toolbox is a wooden—made out of plywood, had a clasp and a padlock.

I placed the key for the padlock in it, lifted the top up. Right on the top was a pair of blue-handled wire cutters. I

shined the flashlight on those and asked are those the ones. He said, yeah, those are them. I asked him which wrench would have been the one he used. There was one of those plastic organizers for open box end wrenches in there. He said he thought it was one of those. He couldn't be sure which one it was.

At trial, the events which took place at Community Alternatives during the early morning hours of December 5, 1991, had to be described in a somewhat different manner because of the district court's suppression order. The arresting officer related that he went to Community Alternatives, identified Appellant, arrested him, and gave him *Miranda* warnings. Continuing, the officer testified:

A While he was getting dressed he pointed out several things to me, the pair of pants, the shirt, jacket, things he wanted to wear. While he was doing that I asked him what *he was wearing when he took the winch*. He pointed to a pair of brown western style work boots sitting on the floor.

Q And what did you do with those boots?

A I asked Mr. Glass to wear those to the jail.

Q Did he?

A Yes.

Q What happened next?

A After Mr. Glass was completely dressed I placed handcuffs on him. I escorted him out the building to where his truck was parked.... We came down—or coming over to where the truck was, like I said, Mr. Glass was handcuffed with his hands behind his back, and he indicated to me that he had keys to the truck in his right-hand coat pocket. And he nodded towards there, said the keys for the truck are in my pocket.

Q Was that in response to a question?

A No.

Q What happened next?

A At that point I spoke to Mr. Glass. I told him that at that point he was under arrest. He wasn't obligated to let me look in his truck or show me anything that may be in there. He told me it's all right. No problem. Told me to get the keys out, get up in the bed of the truck and move a gas can and I'd see a padlock on his tool chest.

Q Did you do that?

A Yes.

Q Did he indicate anything else to you while you were doing that?

A He showed me which key to use to open the padlock. I opened the padlock, lifted—like I said, it's a plywood—a home-built tool chest with a plywood lid. I took the padlock off, lifted up the lid, and at that point he indicated to me a pair of blue-handled wire cutters that were in the back of the truck.

Q In the toolbox?

A Yes, they were laying right on top toward the driver's side.

Q Did he say anything about why he was indicating those wire cutters to you?

A I don't believe at that point we really discussed what the wire cutters were.

Q But he pointed them out to you?

A Yes.

Q Did he point anything else out to you?

A Yes, he pointed out a group of wrenches that were beside the wire cutters in a plastic case like you get for open box end wrenches to hang on the wall. He pointed those out to me. I asked him if he knew which one of these he would have *used to unbolt the winch*, and he said he couldn't be sure which one it was. There was one in this group of wrenches. (Emphasis added.)

In other testimony, an officer identified the wire cutters when they were placed into evidence, as well as a small bit of red plastic "wire, electrical type wire, automotive electrical wire type." Later testimony also revealed that the positive cable of the winch had a red plastic coating. The winch was placed into evidence, so the jury could have readily observed the red plastic wire.

The district court found that Appellant had exercised his right to have a lawyer.

The evidence presented to the district court demonstrated only that Appellant wanted to talk to a lawyer before making a telephone call to a man in Newcastle who, he claimed, offered to buy the winch. However, the district court also found that, after having received *Miranda* warnings and having exercised his right to talk to a lawyer, Appellant spontaneously and voluntarily issued incriminating statements, despite being told that he did not have to answer any further questions since he was under arrest.

■ We begin our consideration of this issue by analyzing whether Appellant was "in custody" when he was questioned. We have held that, before *Miranda* warnings become necessary, the person interviewed must be subject to custodial interrogation. *Wunder v. State*, 705 P.2d 333, 334 (Wyo. 1985). The facts of this case present an almost uncanny replication of the circumstances which were present in *Wunder*. The record demonstrates that the police gave no outward signs that Appellant was not free to leave or ask the police to leave nor any other indication that Appellant was under arrest. Appellant was in his "home," [1] and, though it may have been somewhat inconvenient for Appellant to be awakened at an early hour, the record gives no indication that Appellant was oppressed by the police visit. The record indicates that Appellant was alert, cooperative, responsive, and comfortable during the questioning session. The entire episode lasted about fifteen minutes. Our inquiry is whether a reasonable man in Appellant's position would have considered himself to be in police custody. *Id.* at 335. We hold that, after full consideration of the facts outlined above, no objective manifestations of a custodial setting were present. *See G.R. v. State*, 638 P.2d 191 (Alaska Ct.App.1981), *remanded sub nom. Waring*

*v. State*, 670 P.2d 357 (Alaska 1983); J.F. Ghent, Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring that Suspect Be Informed of His Federal Constitutional Rights Before Custodial Interrogation*, 31 A.L.R.3d 565 at § 7[b] (1970 & 1992 Supp.). In addition, we have held that the test to be used in determining the admissibility of statements given after an arrest and the affording of *Miranda* warnings is whether, under the totality of the circumstances, the waiver of rights was voluntarily, knowingly, and intelligently given. *Solis v. State*, 851 P.2d 1296 (Wyo. 1993); *Stone v. State*, 745 P.2d 1344 (Wyo. 1987); *Sandborn v. State*, 735 P.2d 435 (Wyo.1987).

■ In this instance, the district court determined that Appellant was under arrest as soon as the police officers established that he was, in fact, the owner of the pickup containing the stolen winch. As noted above, the fact that the police may have had probable cause to arrest Appellant for the larceny or for being in possession of stolen property is not the relevant test. We are satisfied that Appellant was not under arrest or in custody until the officers actually placed him under arrest. Under the totality of the circumstances enumerated above, Appellant voluntarily, knowingly, and intelligently waived his constitutional rights and answered additional questions, even in the face of explicit warnings that he was under no compulsion to answer further. We note, as an additional factor in our analysis, that Appellant had abundant experience in encounters with law enforcement officers. During the twenty years preceding the instant case, Appellant was arrested more than ten times, was convicted several times, and

---

**1.** We analyze this particular case, as did the district court, under the premise that Appellant's room at Community Alternatives was his "home." That is the highest standard we could apply to these circumstances. No evidence was presented to show that the room was something other than a "home." However, we do not specifically address the issue of whether a room in a community corrections center is, under all circumstances, of the same species as a "home" for purposes of assessing such constitutional rights as those at issue here. In many instances, specific written agreements, or pertinent rules and regulations, may exist which permit police investigation or intrusion and which make it clear that the resident enjoys something less than the full panoply of constitutional rights which an individual enjoys in his "home."

spent many of his adult years in one form or another of incarceration.

As a result of the district court's suppression order, the inculpatory statements which were ultimately brought before the jury were absolutely minimal and far short of that which might have been admitted into evidence. We hold that the district court did not err in admitting the police officers' testimony or the demonstrative, properly seized evidence.

Affirmed.