Tommy J. KOLB, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 95–167.

Supreme Court of Wyoming.

Dec. 20, 1996.

Sylvia Hackl, State Public Defender; and Deborah Cornia, Appellate Counsel, argued, for Appellant (Defendant).

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Barbara L. Boyer, Senior Assistant Attorney General, argued, for Appellee (Plaintiff).

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN,* and LEHMAN, JJ.

LEHMAN, Justice.

Convicted by jury and sentenced to two consecutive life terms in prison, Tommy J. Kolb appeals his convictions for first degree murder, W.S. 6-2-101(a) (Cum.Supp.1993),

* Chief Justice at time of oral argument.

and aggravated kidnaping, W.S. 6–2–201(a)(iii)(d) (1988). He presents the issues:

Did the trial court abuse its discretion when it refused to allow expert testimony on the defense theory of the case?

Did the trial court err when it failed to suppress the statements made by the Appellant which were obtained in violation of his constitutional rights? .

Did the trial court err when it admitted the hearsay testimony of Carl Haler?

Was the evidence insufficient to support a conviction for first degree murder?

Was Appellant denied effective assistance of counsel due to trial counsel's deficient performance?

We affirm.

The 19–year–old victim, Ms. Sallani, attended Sheridan College during the day and worked the late shift at a local convenience store. On March 12, 1993, she reported to work and left as usual. The following morning, Ms. Sallani's car was discovered near her apartment with her personal effects strewn on the ground beside her car. Family and friends reported her missing.

Carl Haler, whose testimony is the source of Mr. Kolb's third issue, told the police he visited with Ms. Sallani at the convenience store on the evening she disappeared. He spent an hour visiting with her and overheard her telephone conversation with someone named "John." When Mr. Haler called her near midnight, he heard someone come into the store and say, "I'm John." Ms. Sallani then told Haler she had to go. Days later, after news of her disappearance spread, a local rancher told police that a young man had appeared at his home along Big Goose Creek around 3:00 a.m. on the morning of March 13 to ask for help in pulling his Bronco from a ditch. The police contacted a towing service and discovered Mr. Kolb was the young man whose vehicle had been pulled from the ditch.

The police interviewed several people, including Mr. Kolb who said he had been looking for a party on Red Grade Road and slid off the road near Big Goose Creek on the evening Ms. Sallani disappeared. He denied knowing Ms. Sallani or going to the convenience store. Despite extensive search and rescue efforts, Ms. Sallani was not found. However, nearly one year later, on March 29, 1994, her jacket was discovered along Big Goose Creek. Following this discovery, police re-interviewed Mr. Kolb. Mr. Kolb's story from the year before remained consistent. Then, on June 5, a boy swimming in Big Goose Creek discovered the frontal plate of Ms. Sallani's skull. Eventually more body parts were found.

On July 28, the police again approached Mr. Kolb, asking that he come into the police station after work to speak with them. Mr. Kolb arrived around 5:00 p.m. During the course of the evening, Mr. Kolb confessed three times on tape to killing Ms. Sallani. These tapes were played for the jury. Following Mr. Kolb's second taped confession, he was arrested for kidnaping and murdering Ms. Sallani.

Prior to trial, Mr. Kolb sought to suppress the tapes, arguing the confessions were involuntarily given and were the product of a custodial interrogation which occurred in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Mr. Kolb's testimony contradicted the police testimony of whether Mr. Kolb was "mirandized," whether he was physically free to leave prior to his confessions, and when he invoked his right to an attorney. Following the suppression hearing, the district court found that Mr. Kolb had been timely "mirandized" before his confessions, that the confessions were voluntarily given, and that he had intelligently and knowingly waived his *Miranda* rights before confessing.

*Miranda* warnings require police to inform an accused during custodial interrogation that he may remain silent, that anything said may be used against him in court, and that he is entitled to an attorney, either retained or appointed. Because claims of involuntary confessions and *Miranda* violations require this court to review the totality of the circumstances surrounding such claims, *Glass v. State*, 853 P.2d 972, 976 (Wyo.1993) and *Thompson v. Keohane*, —— U.S. ——, ——, 116 S.Ct. 457, 464, 133 L.Ed.2d 383 (1995), a detailed account of relevant facts is developed below.

*DISCUSSION OF ISSUES*

### Admissibility of Expert Testimony

■ Mr. Kolb first argues that the trial court abused its discretion in refusing to allow expert testimony regarding "false confession syndrome." Mr. Kolb had sought to introduce this testimony pursuant to W.R.E. 702, which allows an expert witness to testify in the form of an opinion or otherwise if the scientific, technical or specialized information upon which the testimony is based will assist the trier of fact to understand the evidence or determine a fact in issue. The district court, after receiving the proffered testimony of the psychological expert and arguments of counsel, ruled that the testimony would not assist the jury and prohibited such testimony.

■ We resolve issues of evidentiary rulings under an abuse of discretion standard. *Witt v. State*, 892 P.2d 132, 137 (Wyo.1995). The discretionary range entrusted to the district court for evidentiary rulings on proposed expert testimony is set by W.R.E. 702, and these rulings remain undisturbed unless the appellant demonstrates an abuse of discretion. *Yung v. State*, 906 P.2d 1028, 1037 (Wyo.1995). Thus, Mr. Kolb must demonstrate that the district court acted in a manner which exceeded the "bounds of reason under the circumstances." *DeWitt v. State*, 917 P.2d 1144, 1148 (Wyo.1996).

Against this standard of review, the following facts are relevant. The police interviewed Mr. Kolb on three occasions over a sixteen-month period: shortly after Ms. Sallani disappeared on March 13, 1993; on March 30, 1994, soon after her coat was discovered; and on July 28, 1994, a month after her frontal skull plate was discovered. In the first interview, Mr. Kolb denied knowing Ms. Sallani or ever being in the convenience store. His story in the second interview remained consistent with his first interview.

On the third interview, Mr. Kolb's story began to shift. He suddenly admitted he had been to the convenience store, but continued to deny he ever knew Ms. Sallani. However, he soon admitted that he not only knew her but had met with her after she got off work on the night she disappeared. When law enforcement asked for consent to search his Bronco, Mr. Kolb indicated they might find Ms. Sallani's blood in the vehicle. He said they had playfully wrestled and she had developed a nose bleed. Finally, after further questioning, Mr. Kolb declared, "Let's get this over with," and admitted he had brutally slain Ms. Sallani.

Mr. Kolb made several confessions, three of which were recorded by the police. The recordings indicated that Mr. Kolb met Ms. Sallani at a local park after she finished work on the night she disappeared. Mr. Kolb said they had a brief and limited sexual encounter and he later followed her to her home. He reported becoming enraged that she had gone home rather than to a party. He choked her into unconsciousness and threw her into his Bronco. As she regained consciousness during the drive, he hit her face and head with his fists and a hammer in order to kill her. He lost control of his Bronco while striking her, slid into a ditch and was knocked unconscious. When he regained consciousness, he spotted Ms. Sallani running toward Big Goose Creek. He chased and caught her after she became hung up on a fence. She escaped temporarily by slipping out of her jacket and, again, ran for her life. Unfortunately for Ms. Sallani, she fell as she reached the creek, where Mr. Kolb caught and drowned her.

At trial Mr. Kolb retracted his confessions, testifying he had falsely incriminated himself just so he could get through the interrogation. In order to strengthen his testimony, he sought to introduce expert testimony regarding "False Confession Syndrome." The prosecution objected, and the district court conducted a pretrial hearing to receive testimony from a psychologist. When asked about the scientific basis for "False Confession Syndrome," the psychologist testified it is not a syndrome, but is better understood as a collection of reasons why people may give false confessions. A syndrome, he testified, is a cluster of symptoms which indicate an underlying cause, which in this case would be a psychopathology. The psychologist further testified he had no training regarding "False Confession Syndrome"; "False Con-

fession Syndrome" is not a diagnostic term in psychology; there were no psychological studies supporting "False Confession Syndrome" upon which he could base his testimony; and a retracted confession does not necessarily indicate the confession was false. The district court concluded the proposed testimony was scientifically unreliable and would not assist the jury with understanding the evidence nor in deciding a fact in issue. The court, however, was willing to take judicial notice that false confessions do occur and, if the evidence warranted it, would permit the defense to make that argument during closing.

■ Against this backdrop, Mr. Kolb fails to demonstrate how the district court exceeded the bounds of reason in prohibiting the testimony. When considering the introduction of expert testimony, the district court need be concerned only with the requisite foundation for admissibility as required by W.R.E. 702. *Springfield v. State*, 860 P.2d 435, 442–43 (Wyo.1993). We have previously addressed the propriety of the admissibility and limitation of expert psychological testimony. *Scadden v. State*, 732 P.2d 1036 (Wyo.1987) (allowing "Rape Trauma Syndrome"); *Witt v. State*, 892 P.2d 132 (Wyo. 1995) (limiting "Battered Woman's Syndrome"); *Frenzel v. State*, 849 P.2d 741 (Wyo.1993) (limiting "Child Sexual Abuse Accommodation Syndrome"); and *Sorensen v. State*, 895 P.2d 454 (Wyo.1995) (disallowing "Traumagenic Dynamics"). The admissibility of such testimony is a function of helping the jury understand how particular conduct by the accused or an alleged victim can be viewed as part of a greater pattern of behavior, rather than as an isolated event.

As a threshold matter, the district court must determine whether the underlying theory is reliable by determining if it is scientifically valid "based on the evidence available * * * rather than by simply calculating the consensus in the scientific community." *Springfield v. State*, 860 P.2d at 442. If the underlying theory is reliable and the testimony is relevant to the facts of the case, the opinion testimony could assist the jury with its factual determinations and its admission is appropriate. *Id.*, at 443 (*citing* 3 Weinstein & Berger, *Weinstein's Evidence* § 702[02] at 18, that reliability, relevance and the ability to assist the jury are mutually linked). If a specialized theory upon which an expert relies is unreliable, the expert's opinion has no relevance and exclusion is appropriate. *Id.* Accordingly, in *Sorensen v. State*, 895 P.2d at 458, we held that "traumagenic dynamics" was not developed sufficiently to allow an expert to "make a reasonable opinion based on the use of the theory." "False Confession Syndrome" seems similarly situated based upon the evidence presented to the district court.

The district court noted that Mr. Kolb's expert had conducted no studies nor received formal training in this theory, could identify no seminars that related to "false confession syndrome," and, while the expert referred to one study concerning the psychology of "retracted confessions," even that study was not preserved in the record. At best, the expert had watched one television program which referred to "false confession syndrome." We conclude the district court did not abuse its discretion by prohibiting the testimony after concluding that "false confession syndrome" was unreliable based on the proffered evidence.

### Admissibility of confessions

Mr. Kolb contends the district court erred when it failed to suppress his confessions because those confessions were involuntarily obtained and were obtained in violation of his *Miranda* rights. If true, those statements would not be properly admissible because such police conduct would have impermissibly violated the Fifth and Fourteenth Amendments to the United States Constitution and Art. 1, §§ 6 and 11 of the Wyoming Constitution. Additionally, Mr. Kolb argues that all confessions should have been suppressed as fruit of the poisonous tree pursuant to *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Denial of a motion to suppress is reviewed under an abuse of discretion standard. *Madrid v. State*, 910 P.2d 1340, 1344 (Wyo.1996). When the issue of voluntariness is raised in a suppression issue, the State must prove by a preponderance of the evidence that the con-

fession was voluntary. *Id.*; *Miranda v. Arizona*, 384 U.S. at 444–45, 86 S.Ct. at 1612. If the State cannot carry its burden, then evidence attained either directly or indirectly may not generally be used at trial. *Wong Sun*, 371 U.S. at 485–86, 83 S.Ct. at 416. Because claims of involuntary confessions and *Miranda* violations are resolved after examination of the totality of the circumstances surrounding such claims, a review of all relevant facts is required. *Glass v. State*, 853 P.2d 972, 976 (Wyo.1993); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); and *Thompson v. Keohane*, —— U.S. at ——, 116 S.Ct. at 464.

To determine whether an accused was in custody during an interrogation, two distinct inquires are required: first, what were the circumstances surrounding the interrogation and, second, would a reasonable person have felt at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, —— U.S. at ——, 116 S.Ct. at 465. *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, requires that for statements obtained during custodial interrogation to be admissible, law enforcement must advise an accused of his rights. For purposes of appellate review, factual findings regarding "what happened," which include credibility determinations, are given presumptive weight while findings of voluntariness are questions of law which are reviewed independently. *Thompson*, —— U.S. at ——, 116 S.Ct. at 465. In this case, both the judge at the suppression hearing and the jury at trial resolved the credibility contest against Mr. Kolb.

The third police interview, during which Mr. Kolb confessed to killing Ms. Sallani, began on the evening of July 28, 1994, and lasted, at Mr. Kolb's request, into the early morning hours of the next day. Mr. Kolb had responded to the request of Department of Criminal Investigation agents to speak with them at the police station. Explaining to Mr. Kolb that he was free to leave at any time and that he was not under arrest, the agents did not advise him of his *Miranda* rights. During the interview, Mr. Kolb was offered food and drink and was asked if he wanted to leave. Mr. Kolb declined and

agreed to help clarify the details of the night he slid off the road near Big Goose Creek.

Mr. Kolb then made statements which conflicted with the previous version he had given the year before. He now admitted he had been in the convenience store but denied knowing Ms. Sallani. Around 7:00 p.m., a new agent interviewed Mr. Kolb and again advised that he was not under arrest, not in custody, did not have to answer any questions and could leave. Mr. Kolb declined. While the agents did not "mirandize" Mr. Kolb because they felt he was not in custody, their feelings, if uncommunicated, are irrelevant. *Stansbury v. California*, 511 U.S. 318, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). The inquiry regarding custody under *Miranda* is simple: would a reasonable person feel free to terminate the interview and leave.

Around 7:30 that evening, Mr. Kolb said that he and Ms. Sallani had met at a local park and kissed on the night she disappeared. He slid off the road near Big Goose Creek, he said, after going for a drive to think because he felt guilty that he "had held hands and kissed a woman other than his wife." Mr. Kolb's rapidly evolving story of romantic claims with the victim so concerned the agent that he advised Mr. Kolb of his constitutional rights per *Miranda* shortly before 8:00 p.m. This was the first of four times that Mr. Kolb was formally advised of his *Miranda* rights.

Mr. Kolb took a cigarette break outside the building while the interviewing agent alerted the other agents to Mr. Kolb's evolving story. After this break, Mr. Kolb stated Ms. Sallani had agreed to meet him after work and he drank a case of beer while waiting for her. After another break, Mr. Kolb consented to a search of his Bronco and again shifted his story about his evening with Ms. Sallani, this time dramatically. He explained if there were blood remnants from Ms. Sallani, it was because they had played "Wrestle mania" and he had accidentally head butted her which caused her nose to bleed. He said they returned to his Bronco and, after the bleeding stopped, had fondled one another. He again told the agents that he then went for a drive to think about

having cheated on his wife and slid off the road.

After yet another cigarette break, Mr. Kolb stated he followed Ms. Sallani home from the park and became furious when she did not go to the party which she told him she might attend that night. He approached her car as she parked at her apartment and, reaching into her car, threw her "school books" onto the pavement. Mr. Kolb claimed he then left and never again saw Ms. Sallani. Mr. Kolb then took another cigarette break, joined by one of the agents. After finishing his cigarette, Mr. Kolb told the agent, "Let's go get this over with." He said he was sure the police had what they needed on him and he was tired of lying. And, around 8:20 p.m., a half hour after Mr. Kolb was first advised of his *Miranda* rights, he suddenly confessed to killing Ms. Sallani. He then agreed to take the agents out to Big Goose Creek where he had left her body.

■ After Mr. Kolb confessed to the killing, he was in custody under *Thompson v. Keohane*, —— U.S. at ——, 116 S.Ct. at 459. A reasonable person who confessed to a killing while being interviewed at a police station would not feel free to terminate the interview and leave the station. Thus, the interrogation that followed the confession did so while Mr. Kolb was in custody, approximately one half hour after he had been informed of his *Miranda* rights and after he told the officers that he wanted to continue the interview.

When they reached Big Goose Creek around 9:00 p.m., Mr. Kolb again confessed to killing Ms. Sallani. This confession was secretly recorded by the agent and revealed that Mr. Kolb sobbed for the agent to shoot him while declaring he did not deserve to live. The agent advised he would not shoot him but that unless Mr. Kolb promised not to run, the agent would have to handcuff him. This ultimatum by the agent independently established custody of Mr. Kolb under *Thompson.* Yet another confession was recorded after Mr. Kolb showed the agents where he had slain Ms. Sallani. This recording revealed not only that he had been "mirandized" but that he acknowledged having

been "mirandized" earlier by one of the agents.

Upon returning to the station, an agent asked Mr. Kolb if he would consent to a search of his home. As soon as Mr. Kolb signed the form, he said, "I want a lawyer down here now," indicating a full and intelligent awareness of his *Miranda* rights. Under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), once an accused has invoked his right to counsel, police interrogation must cease until counsel has been made available unless the accused initiates further communications with the police. Not only must the waiver of counsel be voluntary, it must also constitute a knowing and intelligent abandonment of that right. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).

The lead agent was informed of Mr. Kolb's request for an attorney and entered the interview room to formally arrest Mr. Kolb and to request that Mr. Kolb remove everything from his pockets. Mr. Kolb asked what would happen to him, but the agent answered that he could not answer or converse with Mr. Kolb after he requested an attorney. Mr. Kolb responded that he only wanted a lawyer to "grease the skids" and get him into Rawlins without a trial. He advised the agents he wanted to talk with them and answer any questions. The agents then asked Mr. Kolb when he had last eaten, how far he had gone in school, how much he had slept the night before, and if he would rather continue the interview some other time. When Mr. Kolb said he wanted to continue the interview, he knowingly and intelligently abandoned his invoked right to counsel.

Around midnight, the agents asked if Mr. Kolb would be more detailed about the killing, and he agreed but asked if he could continue the interview in another location. The agents took him to a motel room where they, again, tape recorded his confession for a third time. After returning to the jail and being left to sleep, later in the afternoon, Mr. Kolb again requested to speak with the agent, and the agent briefly complied.

■ Prior to trial, defense counsel moved to suppress the confessions. At the evidentiary hearing, held pursuant to *Jackson v.*

*Denno,* 378 U.S. 368, 380, 84 S.Ct. 1774, 1783, 12 L.Ed.2d 908 (1964), Mr. Kolb testified that he had falsely confessed simply to end the interview, that he was in custody before giving his false confessions because the doors to the interview room had been locked, and that the agents had deceived him into making the false confessions. While the question of whether a voluntary, knowing and intelligent waiver of rights can be affected by police deception, the agents' testimony contradicted that of Mr. Kolb. The credibility question was resolved against Mr. Kolb, and the court's finding of "what happened," *Thompson,* —— U.S. at ——, 116 S.Ct. at 459, is given presumptive weight. The court found that Mr. Kolb had been "mirandized" before he had been in custody, had knowingly waived his rights to counsel and to remain silent, and had voluntarily given his confessions. Additionally the court found the agents properly suspended their questioning once Mr. Kolb invoked his right to counsel and continued only after he insisted on continuing the interview. While there was no written waiver of the right to counsel, the court found that the recorded dialogue overwhelmingly confirmed Mr. Kolb's waiver and comported with *Best v. State,* 736 P.2d 739 (Wyo.1987). We agree and hold the admission of confessions was proper. In so holding, we need not consider the fruit-of-the-poisonous-tree claim.

### Admissibility of Mr. Haler's Testimony

Mr. Kolb argues that the district court erroneously permitted the prosecution to elicit testimony from Mr. Haler regarding phone conversations and dialogue he had with Ms. Sallani. Mr. Haler testified that he had met Ms. Sallani the evening before she disappeared when she rang up his purchase at the store. Wanting to get to know her better, Mr. Haler had gone into the store to visit with her. When he entered the store, Ms. Sallani asked if he was "John." She told Mr. Haler the reason she asked was "that someone had been calling her and said that they were going to stop by and see her and his name was John." While visiting with Ms. Sallani, "John" telephoned, and Mr. Haler heard her say to the caller, "Oh, you can," as she peered out the store window. Mr. Haler

went home and later called Ms. Sallani at the store. He heard someone in the background say, "I'm John." Mr. Haler asked Ms. Sallani if that was John. She replied that it was and told Mr. Haler she'd better go.

Mr. Kolb contends that Mr. Haler's statements were offered by the State to prove the truth of the matter asserted and were, therefore, hearsay. Further, these statements were inadmissible under any of the firmly rooted hearsay exceptions and were not sufficiently reliable to qualify for admission under the catchall exception of W.R.E. 804(b)(6). The State responds that the various statements were either non-assertive or not offered for the truth of the matter asserted and, therefore, not hearsay. Even if they were hearsay, the State argues, the statements would be admissible under various exceptions provided for in the rules.

This court will not disturb a trial court's evidentiary rulings on appeal absent a clear abuse of discretion. *Witt v. State,* 892 P.2d 132, 137 (Wyo.1995). After reviewing Mr. Haler's testimony, we find with one exception that his statements were properly admitted by the district court. With regard to the one statement erroneously admitted by the district court, we find its admission was harmless error.

As a general rule, hearsay evidence is not admissible except as provided by the Rules of Evidence or other law. W.R.E. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). A "statement" is an oral or written assertion or nonverbal conduct intended as an assertion. W.R.E. 801(a). The word "statement" means "a single declaration or remark," rather than "a report or narrative," so that when ruling on the admissibility of a narrative, we must break down the narrative and determine the separate admissibility of each "single declaration or remark." *State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75, 91 (1995); *see Williamson v. United States,* 512 U.S. 594, —— – ——, 114 S.Ct. 2431, 2434–35, 129 L.Ed.2d 476 (1994) (discussing hearsay in the

context of F.R.E. 804(b)(3) exception for statements against interest).

■ Mr. Haler's testimony that Ms. Sallani asked him, "Are you John?" does not qualify as hearsay because her question is not an assertion. The rules do not define "assertion," but a definition commonly used for evidence purposes declares that an assertion is "to say that something is so, *e.g.*, that an event happened or that a condition existed." *Armstrong v. State*, 826 P.2d 1106, 1118 (Wyo.1992) (*citing* E. Cleary, *McCormick on Evidence* § 246 (3d ed. 1984)). Ms. Sallani's question does not say that an event happened or that a condition existed. It does not assert anything and is, therefore, not hearsay.

■ Mr. Haler testified that Ms. Sallani received a phone call and remarked "Oh, you can" to the caller while she peered out the window. Arguably, that statement and behavior are nonassertive and, therefore, not hearsay. However, even if Ms. Sallani intended by her words and conduct to assert that John could see her, the State did not offer the evidence to prove that the caller could see Ms. Sallani. If an out-of-court statement is offered without reference to the truth of the matter asserted, the hearsay rule does not apply. 6 *Wigmore on Evidence* § 1766, at 250 (Chadbourn Revision 1976). Statements not offered for the truth of the matter asserted must nevertheless be offered for a relevant purpose. *Longstreth v. State*, 832 P.2d 560, 562–63 (Wyo.1992). The words and conduct at issue here were relevant for the fact they were made. The statements were circumstantial evidence from which the trier of fact could, regardless of their truth, infer that Mr. Kolb was the caller, because Mr. Kolb stated in his confession that he had talked to Ms. Sallani on the phone and jokingly told her he could see her from where he was calling.

■ Mr. Haler testified that later, when he was talking to Ms. Sallani on the phone, he heard someone say, "I'm John." That statement was not offered for its truth—that the person speaking was "John." Again, the statement was relevant for the fact it was made—that someone claiming to be John was

in the store. The State sought to prove that Mr. Kolb and John were one and the same through other, nonhearsay evidence, namely Ms. Sallani's "Oh, you can" statement which she made while peering out the window and Mr. Kolb's confession. Therefore, Mr. Haler's testimony that he heard someone say "I'm John" is not hearsay.

■ Mr. Haler testified that he then asked Ms. Sallani if John was there. She replied that he was and that she'd better go. Ms. Sallani's assertion *was* offered for its truth—that "John" was in the store—and, as such, is hearsay. However, the remark was a present sense impression, which is an exception to the hearsay rule. A present sense impression is "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." W.R.E. 803(1). Ms. Sallani acknowledged to Mr. Haler that John had entered the store immediately after Mr. Haler heard the person identify himself as John—while she was perceiving the event. Because the hearsay falls within an exception provided for by the Rules of Evidence, its admission was within the discretion of the trial court judge.

■ Finally, we come to Ms. Sallani's explanation for asking Mr. Haler if he was John. Mr. Haler testified that Ms. Sallani said someone had been calling and was coming over to see her, and that his name was John. According to the State, this testimony was not offered for its truth, that is, to prove someone named "John" had been calling her and was coming by later. Instead, the State argues, the testimony was offered to establish that Ms. Sallani had been receiving phone calls, as a basis for her refusal to attend parties with other men who came into the store, and to provide an explanation of the officer's questions of Mr. Kolb regarding whether he had ever called Ms. Sallani at work. However, the relevance of Ms. Sallani's assertion depends upon its truth—that she had been receiving phone calls and that someone calling himself John was coming to see her. If the assertion were not true, it would not serve the purposes for which the State claims it is being offered. There being no applicable hearsay exception under which

this statement is admissible, we find that it was error to admit that portion of Mr. Haler's testimony describing Ms. Sallani's explanation about John.

 That conclusion does not end our analysis, because we must determine whether this error was harmless. Wyoming Rules of Appellate Procedure 9.04 provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court." *See also* W.R.Cr.P. 52(a). For an error to be regarded as harmful, there must be a reasonable possibility that, in the absence of the error, the verdict might have been more favorable to the defendant. *Roderick v. State,* 858 P.2d 538, 550 (Wyo.1993) (referring to rule numbers in effect prior to 1992 revisions). The bulk of Mr. Haler's testimony was admissible and conveyed the essential information to the jury—that someone calling himself John did telephone and did come into the store. Other evidence presented which served to establish Mr. Kolb's guilt included the "Oh, you can" statement linking Mr. Kolb to the phone call and physical evidence and testimony of several witnesses in the case. Most importantly, the State presented Mr. Kolb's detailed confessions of the circumstances surrounding the murder and the murder itself. Given the strength of the other evidence and the nature of the erroneously admitted statement, we find that the admission of Ms. Sallani's statement that John had been calling and was coming over to see her did not affect the outcome of the trial and, therefore, consider it to be harmless error.

### Was the Evidence Insufficient to Support a Conviction for First Degree Murder

 The standard of review is well established. The court determines whether the jury could have reasonably inferred guilt beyond a reasonable doubt when the evidence is viewed in the light most favorable to the State. *Hightower v. State,* 901 P.2d 397, 401 (Wyo.1995). When this issue includes the premeditative element of first degree murder, the court looks to the standard of review established in *Bouwkamp v. State,* 833 P.2d 486, 494–95 (Wyo.1992).

There the court held that combinations of evidence of planning prior to a killing, of a relationship with or conduct toward the victim, and the manner of the killing can prove premeditation. Because Mr. Kolb challenges the sufficiency of the evidence regarding premeditation, *Bouwkamp* controls. The evidence offered by Mr. Kolb's confessions encompasses all categories of premeditative evidence discussed in *Bouwkamp* and is sufficient to sustain his conviction for first degree murder.

Mr. Kolb told the police that he followed her home and became so angry that he choked her into unconsciousness, threw her into his Bronco, and drove into the countryside. When she regained consciousness while he was driving, she declared she would tell his wife and the police. At that point, Mr. Kolb confessed to hitting her head with a hammer with the intent to kill her. While striking her, he ran his Bronco into the ditch, knocking him unconscious. When Mr. Kolb came to, Ms. Sallani was running for her life. He chased her down, pulled her into the water, and held her under until she drowned.

Evidence that he planned to kill her is established by his confession to striking her in order to kill her to prevent her from reaching his wife or the police. Evidence that he chased her down, pulled her into the water and held her under water until she drowned is evidence of conduct toward the victim and a manner of killing from which the jury could have reasonably inferred premeditation. We find the evidence sufficient to sustain the conviction for first degree murder.

### Effective Assistance of Counsel

 Mr. Kolb argues that his defense counsel was ineffective because he failed to investigate this case by having a defense expert evaluate the partial skull. The partial skull, which contained a tooth, was the frontal plate found by the boy swimming in Big Goose Creek. The State's expert identified the skull plate as belonging to Ms. Sallani by comparing that tooth with her dental records.

Wyoming law requires some proof of the *corpus delicti* apart from an extra-judicial confession by the accused in order to prove the commission of a crime, *Betzle v. State*, 847 P.2d 1010, 1021 (Wyo.1993), and defines *corpus delicti* for criminal homicide as evidence of death caused by a criminal act. *Alcala v. State*, 487 P.2d 448, 451 (Wyo.1971). From this state of the law, Mr. Kolb argues that defense counsel was ineffective because counsel did not investigate the case by having an expert evaluate whether the tooth necessarily established that the skull plate was Ms. Sallani's. Mr. Kolb argues that the skull fragment only established the threshold for *corpus delicti.*

To warrant reversal of a conviction based upon claims of ineffective assistance of counsel, an appellant must establish the attorney's performance was less than what a reasonably competent attorney would have done and that the deficient performance so undermined the proper function of the adversarial process that the trial cannot be relied upon as having produced a just result. *Jackson v. State*, 902 P.2d 1292, 1295 (Wyo.1995). While some professional deficiencies need no proof of prejudice, *King v. State*, 810 P.2d 119, 122 (Wyo.1991); *Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992); *Shongutsie v. State*, 827 P.2d 361, 364 (Wyo.1992), the issue at bar is not such a claimed deficiency.

Against this standard, the court views a trial counsel's acts or omissions in light of all the circumstances and strongly presumes that counsel gave effective assistance and that all significant decisions were the product of professional judgment. *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo.1995). The reasonableness of counsel's conduct may be determined or influenced by the defendant's statements or actions, *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986), as well as other evidence. Defense counsel must make professional strategy decisions based on attorney-client privileged information, information which never appears on the record. So situated, the court does not evaluate defense trial conduct from the perspective of hindsight but rather from the circumstances that surrounded the challenged professional conduct. *Dickeson v. State*, at 609. The reason-

ableness of investigative decisions depends on other evidence, and this court considers the strength of the evidence known to counsel which might have suggested whether further inquiry was needed. *Frias*, at 145.

The circumstances against which this ineffectiveness claim is measured include evidence that Ms. Sallani had been missing for over a year; a violent abduction occurred near her car; and, not far from where Mr. Kolb ran into a ditch, Ms. Sallani's tennis shoe with part of her foot still inside and her jacket with her library card and driver's license were found. Additionally, Mr. Kolb's defense theory was not that Ms. Sallani was alive but only that he had falsely confessed to killing her. The State's expert helped establish only that Ms. Sallani was dead. On this record we cannot say counsel was deficient for not further investigating the identity of the skull.

Affirmed.