2003 WY 132

**John DANIEL, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**Nos. 02–45, 02–46, 02–47.**

Supreme Court of Wyoming.

Oct. 23, 2003.

Representing Appellant: Ken Koski, State Public Defender; Donna D. Domonkos, Ap-

pellate Counsel; Marion Yoder, Senior Assistant Public Defender. Argument by Ms. Yoder.

Representing Appellee: Hoke MacMillan, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Hugh Kenny,* Senior Assistant Attorney General; Kimberly A. Baker, Senior Assistant Attorney General. Argument by Mr. Kenny.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] After his first trial ended in mistrial, the second trial of Appellant John Daniel resulted in conviction on two counts of first-degree sexual assault. His habitual criminal status was determined, and he was sentenced to two consecutive life sentences. Daniel filed a notice of appeal, but the appellate process was delayed for almost two and one half years, initially because of the court reporter's tardy submission of trial transcripts from both trials, then because of post-trial proceedings inquiring about the consequences for such delay. Daniel contends that his convictions should be reversed for this delay, insufficient evidence, shackling during his trial, and ineffective assistance of counsel. He also challenges the constitutionality of imposition of two consecutive life sentences.

[¶ 2] We affirm.

## ISSUES

[¶ 3] Daniel presents this statement of the issues:

1. Has the extraordinary delay in the docketing of this matter deprived appellant of his right to a meaningful appeal?

2. Was there sufficient evidence of appellant's violation of each element of W.S. § 6–2–302 to sustain two convictions for first degree sexual assault?

3. Was appellant properly sentenced to serve two, consecutive life sentences or was the trial court limited to the assess-

ment of "a" life sentence under the habitual criminal statute, W.S. § 6–10–201?

4. Has appellant been rendered effective assistance of counsel below?

5. Whether the practice of noticeably restraining the defendant at jury trial violates constitutional rights?

The State rephrases the issues as:

1. Whether the delay in docketing has deprived appellant of a meaningful appeal?

2. Whether sufficient evidence supports appellant's convictions for first degree sexual assault?

3. Whether the district court erred in sentencing appellant?

4. Whether appellant received effective assistance of counsel?

5. Can the unchallenged shackling of appellant during trial as a security measure due to his recent history of violence in pretrial detention, where the jury was not aware of the shackling, give rise to a constitutional violation?

## FACTS

[¶ 4] At approximately 4:30 a.m. on January 14, 1999, the forty-year-old female victim arrived at a Casper, Wyoming, hospital and reported that she had been physically and sexually assaulted for many hours that immediately preceding night. The victim had been taken to the hospital by Daniel who pointed out bruising on the victim's head to a nurse. The victim had extensive bruising, ligature marks on her ankles and wrists, and medical testing indicated seminal fluid from vaginal sexual intercourse but seminal fluid was not found which could confirm the victim's report that she had been subjected to multiple episodes of anal penetration. No DNA testing was performed. A medical examination of the victim did not indicate any trauma to either the vaginal or anal areas. The pubic area was shaved, but that condition did not appear recent to either the examining physician or nurse.

[¶ 5] The victim first reported that a white male with brown hair had attacked her

* Notice of Withdrawal of Counsel filed by Mr. Kenny on June 2, 2003

by railroad tracks, had tied her up, shaved her pubic area, physically and sexually assaulted her, and left her there. She freed herself from her restraints, walked part of the way to the hospital and then was given a ride. The victim made the same statement at the police department; but when a police search did not indicate any evidence of the crime at that location, the victim told police that Daniel had sexually assaulted her at his apartment. The victim took police to the apartment and identified Daniel as her attacker. He was arrested at that time.

[¶ 6] Police obtained a warrant to search Daniel's apartment and found evidence in the apartment and outside garbage containers corroborating the victim's account of her attack, including an electric razor, a bra, string in the bedding, and sheets that appeared to be stained with blood. The victim related that she and her boyfriend had met Daniel for the first time at a bar on the evening of January 13. Videotape from the bar confirmed that all three had been at the bar that evening, and Daniel and the victim had left the bar together, followed seconds later by her boyfriend. Medical testing indicated seminal fluids consistent with Daniel's blood type. Based on the victim's account of the attack, Daniel was charged with three counts of first degree sexual assault, in violation of Wyo. Stat. Ann. § 6–2–302(a)(i) or (ii), and one count of kidnapping in violation of Wyo. Stat. Ann. § 6–2–201(a)(i)(ii)(iii) and (b)(i). The State also sought habitual criminal status under Wyo. Stat. Ann. § 6–10–201 based upon Daniel's prior felony convictions.

[¶ 7] Both sides filed pretrial motions, and hearings were held and rulings made on those motions. At the end of one hearing, defense counsel requested that the court remove arm and leg restraints from Daniel during trial. The trial court deferred to court security's decision that arm restraints could be removed, but leg restraints would remain during trial. The trial court agreed to revisit the issue if Daniel decided to testify. Daniel did not testify at trial.

[¶ 8] Trial began on July 19, 1999, and, at the close of the State's case, the court granted the defendant's motion for judgment of acquittal on one count of first degree sexual assault. The remaining three counts were deliberated upon by the jury, which hung. The trial court declared a mistrial, and trial was rescheduled for one month later. Defense counsel filed a motion for appointment of a public defender because Daniel had no funds to pay for counsel; however, the trial court denied that motion. At the second trial, the victim's account of her attacks varied considerably from her previous statements to police and testimony at the first trial. The State indicated that inconsistencies were caused by brain damage the victim suffered from a 1992 car accident. Despite the inconsistencies, the second jury convicted on the two counts of first degree sexual assault but was unable to reach a verdict on the kidnapping charge. The trial court declared a mistrial on that charge, accepted the verdict, and proceeded to the habitual criminal status phase of the trial.

[¶ 9] After hearing that Daniel had been convicted of grand theft from a person in 1990 and twice convicted of burglaries in 1991 and 1993, the jury deliberated and returned a verdict finding Daniel to be a habitual criminal. The court proceeded immediately to sentencing, and Daniel was sentenced to two consecutive life sentences. Notice of appeal was filed on September 14, 1999; however, the court reporter received numerous extensions to file the trial transcript and did not certify completion until November 13, 2000. It was then learned that transcripts of motion hearings reported by another court reporter had not been prepared. The district court clerk did not certify that the transcripts had been filed until February 1, 2001. Appellate counsel filed motions to dismiss for lack of prosecution, arguing that Daniel had been denied his rights to due process and speedy appeal. Appellate counsel also requested that the transcripts from the first trial be prepared and filed. This Court ordered that the first trial's transcripts be filed and, after they were produced, this appeal was docketed in this Court on March 1, 2002, almost two and one half years after notice of appeal was filed.

[¶ 10] This Court noted that Daniel had been shackled during his trial and remanded

for an evidentiary hearing to determine whether Daniel's constitutional rights had been violated because of the shackling. The trial court determined that the evidence showed that the leg restraints could not be seen or heard by the jury during trial, the jury did not view Daniel while he was shackled, and that no constitutional violation or prejudice occurred. Supplemental briefing by both parties was submitted on this determination.

## DISCUSSION

*Shackling*

 [¶ 11] During a pretrial hearing, the court denied the defense's request that Daniel not be shackled during his trial although it agreed that it might revisit the issue if Daniel desired to testify. The record did not indicate whether shackling occurred, and this Court remanded for a determination of whether Daniel had been shackled during his trial. The district court held an evidentiary hearing on May 30, 2002, and issued its order on June 12, 2002. At the time of that hearing, the district court was without benefit of this Court's opinions in *Asch v. State*, 2003 WY 18, 62 P.3d 945 (Wyo.2003); *Urbigkit v. State*, 2003 WY 57, 67 P.3d 1207 (Wyo. 2003); and *Simmons v. State*, 2003 WY 84, 72 P.3d 803 (Wyo.2003).[1]

 [¶ 12] *Asch* held that a defendant has a constitutional right to be free from shackles or other restraints except in extraordinary circumstances. *Asch*, ¶ 57. Unless compelling necessity demands restraint, shackling or other bonds violates a defendant's right to a fair and impartial trial as protected by the Sixth and Fourteenth Amendments of the United States Constitution, *id.*, and Art. 1, §§ 6 and 10 of the Wyoming Constitution. *See Asch*, ¶ 57. *Asch* held that it is an abuse of discretion for a trial court to require a defendant to be shackled or otherwise physically restrained in the courtroom during a jury trial "unless the State has first moved that such measures be utilized, the court has heard such motion, and after allowing the defendant an opportu-

nity to contest the motion, the court has stated on the record the compelling reasons justifying the measures." *Id.* at ¶ 62. "At such hearing, the State has the burden of establishing the necessity for particular restraints and that such restraints are the least drastic effective measures available." *Id.* "The trial court must consider alternatives and may not rely blindly on the judgment of correctional officers." *Id.* In exercising discretion, the court should consider at least the following factors:

> The seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Id.*

[¶ 13] *Asch* determined that the trial court abused its discretion by allowing the defendant to be shackled in the courtroom throughout his trial without first requiring the State to justify such restraints on the record. *Id.* at ¶ 65. However, in *Urbigkit*, we reached a different decision based on the different circumstances of that case. Urbigkit was accused of numerous counts of aggravated assault and attempted murder following a violent gun battle with police. Before trial, Urbigkit requested trial without shackling. A pretrial hearing was held, and, although this Court determined that the specific requirements of *Asch* were not met by the district court during that hearing, and although the circumstances present there came "uncomfortably close" to violating *Asch*, we were able to determine from the record that the district court had determined that compelling reasons existed for the use of re-

---

1. Because we reversed on other grounds in *Simmons*, this Court made no decision regarding shackling; however, we reiterated that the principles of *Asch* applied upon retrial.

straints during trial and, therefore, did not abuse its discretion. *Urbigkit*, ¶ 24.

[¶ 14] This case appears to be most similar to the facts in *Asch*. The evidentiary hearing established that Daniel was shackled during his trial without benefit of a pretrial hearing for the State to establish justification for shackling and, thus, an abuse of discretion occurred. *Asch*, ¶ 65. Although *Asch* held that a defendant's right to a fair trial was not adequately protected by a rule that required him to prove actual prejudice from in-court shackling, and further determined that the inherently prejudicial procedure of shackling during trial was an unacceptable risk to the presumption of innocence, ¶ 59, this Court stated that the pretrial hearing requirement of determining whether extraordinary circumstance warranted shackling would apply in future cases. ¶ 62. Daniel was tried several years before the *Asch* opinion was published, thus necessitating a post-trial evidentiary hearing to determine whether Daniel's constitutional rights had been violated by his having been shackled without benefit of a pretrial hearing and in view of the jury.

[¶ 15] Generally, an error that violates a constitutional right of the accused is presumed to be prejudicial, unless the reviewing court is able to declare its belief that the error is harmless beyond a reasonable doubt. *Harlow v. State*, 2003 WY 47, ¶ 43, 70 P.3d 179, ¶ 43 (Wyo.2003). Although many states have found that a trial court's abuse of discretion in allowing shackling is not harmless error, others, including Washington whose law was heavily relied upon in *Asch*, have found that such an error is harmless where there is overwhelming evidence of the defendant's guilt. *State v. Finch*, 137 Wash.2d 792, 975 P.2d 967, 1006–07 (1999) (collecting cases). Washington has also held that shackling is harmless error when the jury never saw the defendant in shackles and the defendant failed to show he was prejudiced in any way. *Id.* at 1006 (citing *State v. Hutchinson*, 135 Wash.2d 863, 959 P.2d 1061 (1998)). In Daniel's case, the trial court abused its discretion by failing to hold a pretrial hearing on whether shackling for trial was appropriate; however, a post-trial

ruling held that the jury did not view or hear the defendant in shackles during trial. If this ruling is supported by the evidence, then these circumstances demonstrate that Daniel was not prejudiced by shackling during trial. Under these circumstances, we hold that a trial court's abuse of discretion in allowing shackling without following the principles of *Asch* is subject to harmless error review.

[¶ 16] On direct appeal, the State has the burden of proving that the constitutional errors below were harmless beyond a reasonable doubt. *Gentry v. State*, 806 P.2d 1269, 1272 (Wyo.1991). Because the State was without benefit of our *Asch* opinion, its argument was limited to Daniel's failure to show prejudice; however, *Harlow* held that we have discretion to overlook the government's failure to argue harmlessness in an appropriate case. *Harlow*, ¶¶ 44–46. In deciding whether to exercise that discretion, a reviewing court may consider such factors as the length and complexity of the record, whether the harmlessness of the error is certain or debatable, and whether a reversal would result in protracted, costly, and futile proceedings in the trial court. *Id.*

[¶ 17] In this case, the record of the two trials reveals nothing concerning the prejudicial effect of Daniel's shackling. The record from the evidentiary hearing is brief and limited to the shackling issue so it is not lengthy or complex. The harmlessness of the error is certain based on evidence indicating that procedures were in place to prevent the jury from viewing the shackles, those procedures were utilized, an in-court demonstration during the evidentiary hearing indicated that the jury could not see the shackles from the jury box, and the trial court determined that the shackling was not viewed or heard by the jury. Finally, we find that reversing and remanding for retrial would result in protracted and costly proceedings that would ultimately prove futile for Daniel.

[¶ 18] We must be convinced beyond a reasonable doubt that no reasonable possibility exists that the shackling contributed to the jury's determination of guilt. *See Harlow*, ¶ 47. The trial court's factual findings regarding whether the jury viewed Daniel in

shackles will be upheld unless clearly erroneous. Daniel disputes the trial court's finding that the jury did not view or hear his shackles and contends that he testified at the evidentiary hearing that the jury twice viewed him in shackles as he was brought into the courtroom and, throughout the trial, the jury could hear his shackles when he moved. A defense investigator testified at the evidentiary hearing that Daniel walked in front of the jury on one particular occasion; however, that witness could not recall if this occurred during the first trial that ended in mistrial or the second that ended in a guilty verdict. The State presented evidence at the evidentiary hearing showing that the trial court's trial procedure was to seat the defendant before the jury was brought into the courtroom, and witnesses had no recollection that this procedure varied in Daniel's case. A demonstration during the evidentiary hearing indicated that Daniel's shackles could not be seen once the jury was seated in the jury box. Based on this evidence, the trial court found that no direct evidence established that the jury saw or heard Daniel's shackles, and our review indicates these finding are supported by the evidence in the record.

[¶ 19] The state of the evidence as shown by the evidentiary hearing and the mistrials declared in the first trial and on the kidnapping count in the second trial convince us beyond a reasonable doubt that no reasonable possibility exists that the shackling contributed to the jury's determination of guilt. We find that the trial court's abuse of discretion in allowing the shackling of Daniel during trial is harmless error.

*Sufficiency of the Evidence*

[¶ 20] Daniel contends that the district court properly granted a judgment of acquittal on the third count of first degree sexual assault because of the unreliability of the victim's testimony, but erred in refusing to grant a judgment of acquittal on the remaining counts. Daniel contends that, despite trial counsel's failure to renew that motion at the close of the defense's presentation of evidence, sufficient evidence does not exist to sustain his convictions on the two counts of first degree sexual assault.

[¶ 21] Our standard of review for sufficiency of the evidence challenges is:

This Court assesses whether all the evidence which was presented is adequate enough to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State. We will not substitute our judgment for that of the jury when we are applying this rule; our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did.

*Robinson v. State*, 11 P.3d 361, 368 (Wyo. 2000) (quoting *Hodges v. State*, 904 P.2d 334, 339 (Wyo.1995)) (citing *Baier v. State*, 891 P.2d 754, 761 (Wyo.1995)).

[¶ 22] Daniel contends that the record shows that a comparison of the victim's several statements to police and her testimony from both trials reveals that she has told a fantastic, self-contradictory story that is internally inconsistent and patently unbelievable. Additionally, he claims that the disinterested expert witnesses could not confirm that the victim's injuries were caused by sexual assault as opposed to consensual sexual intercourse and testified that a blood type inconsistent with either the victim's or Daniel's blood type was found on the victim's underwear. Noting that the jury failed to believe the victim when she claimed that she had been kidnapped, Daniel asks this Court to find that the victim's testimony itself creates reasonable doubt, and the jury's verdict was the result of speculation.

[¶ 23] The record shows that the victim's testimony was self-contradictory; however, those inconsistencies were argued to the jury by counsel in closing argument. Inconsistencies and contradictory testimony are relevant to the weight and credibility of the witness and, therefore, it is the jury which must assess those matters as the trier of fact. *Trujillo v. State*, 880 P.2d 575, 578 (Wyo.1994). This Court cannot reweigh the evidence or reexamine the credibility of the witnesses. *Id.; Pisano v. State*, 828 P.2d 666, 669 (Wyo.1992). We must assume that

the jurors believed only the evidence adverse to the defendant. *Walston v. State,* 954 P.2d 987, 988–89 (Wyo.1998).

[¶ 24] Viewed in the light most favorable to the State, the record shows that physical evidence corroborated the victim's version of events that her injuries were received when sexually assaulted. Pictures demonstrated and medical personnel testified that she had suffered injuries from physical restraint and battery, and the police found her bra, a string consistent with string that she claimed was used to tie her hands and feet, and bloodstained sheets. Medical tests indicated the presence of fluids consistent with the defendant's blood type. An expert testified that a blood type not belonging to Daniel was found on the victim's underwear but could not determine if that different blood type result was caused by fluid from another person or by bacterial, soil, or a detergent contaminant. Although this evidence was all consistent with the defense theory that consensual sexual intercourse had occurred and the victim was beaten by her boyfriend later that night, the jury was solely responsible for that determination. The conviction is supported by sufficient evidence.

*Legality of Imposing Two Consecutive Life Sentences Under The Habitual Criminal Statute*

[¶ 25] Daniel challenges the imposition of two consecutive life sentences under the habitual criminal statute, Wyo. Stat. Ann. § 6–10–201 (LexisNexis 2003),[2] on two grounds: first, that the statutory language does not permit more than one sentence enhancement, and second, that the imposition of two consecutive life sentences is cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

[¶ 26] Since our decision in *Rich v. State,* 899 P.2d 1345 (Wyo.1995), the law has been settled that life sentences for a fourth and fifth felony are required under § 6–10–201, when a defendant is adjudicated a habitual criminal. *Id.* at 1347. *Rich* upheld the trial court's decision to impose three consecutive life sentences for first degree sexual assaults constituting distinct crimes. Daniel contends, however, that *Rich* is distinguishable from his convictions arising out of just one sexual assault occurrence. He contends that the disproportionate harshness of two consecutive sentences to life is demonstrated because he is ineligible for parole[3] although this is his only violent felony conviction, and this disproportionality constitutes cruel and unusual punishment. The State contends that we have previously decided that the portion of the habitual criminal statute enhancing a sentence to ten to fifty years for two prior convictions is not cruel and unusual punishment under the Eighth Amendment and that reasoning applies to a sentence enhancement of life imprisonment, citing *Oakley v. State,* 715 P.2d 1374 (Wyo.1986).

[¶ 27] In *Oakley,* we considered the several decisions by the United States Supreme Court addressing when sentence enhance-

---

2. § 6–10–201. "Habitual criminal" defined; penalties.
 (a) A person is an habitual criminal if:
 (i) He is convicted of a violent felony; and
 (ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.
 (b) An habitual criminal shall be punished by imprisonment for:
 (i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;
 (ii) Life, if he has three (3) or more previous convictions.

3. § 6–10–301. Life imprisonment without parole.
 (a) Pursuant to article 3, section 53 of the Wyoming constitution, a sentence of life imprisonment without parole is created for specified crimes designated in the Wyoming Criminal Code of 1982.
 (b) A person sentenced to life imprisonment without parole shall not be eligible for parole and shall remain imprisoned under the jurisdiction of the department of corrections during the remainder of his life unless pardoned by the governor.
 (c) A sentence specifically designated as a sentence of life imprisonment without parole is not subject to commutation by the governor. A sentence of life or life imprisonment which is not specifically designated as a sentence of life imprisonment without parole is subject to commutation by the governor. A person sentenced to life or life imprisonment is not eligible for parole unless the governor has commuted the person's sentence to a term of years.

ment constituted cruel and unusual punishment to arrive at our decision that § 6–10–201(b)(i) does not violate the Eighth Amendment. The Court recently reviewed this same jurisprudence in its latest consideration of this issue in connection with California's "three strikes law," statutory schemes that are "designed to increase the prison terms of repeat felons." *Ewing v. California,* 538 U.S. 11, ——, 123 S.Ct. 1179, 1182, 155 L.Ed.2d 108 (2003). Ewing had been convicted of felony grand theft in excess of $400 for stealing three golf clubs; however, because he had previously been convicted of three burglaries and a robbery, all considered serious or violent felonies, the three strikes law applied and Ewing was sentenced to 25 years to life. *Id.* at 1183–85.

[¶ 28] *Ewing* resulted in a majority decision that California's three strikes law constitutionally addresses recidivism without violating the Eighth Amendment ban of cruel and unusual punishment. *Id.* at 1190. However, the Court's analysis for arriving at that conclusion garnered only plurality support, and its application of those principles relied upon in *Ewing* are unclear enough to have caused the Court to reject the opinion that its case law was clear or consistent enough to be clearly established federal law within the meaning of 28 U.S.C. § 2254(d). *Lockyer v. Andrade,* 538 U.S. 63, ——, 123 S.Ct. 1166, 1173, 155 L.Ed.2d 144 (2003). The Court did find that it was clearly established that a gross disproportionality principle does apply to sentences for terms of years;[4] however, the precise contours of that principle "are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* The Court held that *Lockyer* was not one of those exceedingly rare or extreme cases. *Id.*

[¶ 29] Lockyer stole about $150.00 worth of videotapes and was convicted of two counts of petty theft. He had previously been convicted of three counts of residential burglary, which California's three strikes law considers "serious or violent" felonies, and which made him eligible for sentence enhancement. Lockyer received two consecutive sentences of twenty-five years to life

imprisonment, although he will be eligible for parole in about fifty years. *Lockyer,* 538 U.S. at —— – ——, 123 S.Ct. at 1169–71.

[¶ 30] In both *Ewing* and *Lockyer,* the Court considered its previous decisions in *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). *Rummel* held that the Eighth Amendment did not prohibit a state from sentencing a three-time offender to life in prison with the possibility of parole for the justified purpose of addressing recidivism. *Ewing,* 538 U.S. at ——, 123 S.Ct. at 1185. In another recidivism case, *Solem* found that a life sentence without possibility of parole for a seventh nonviolent felony was prohibited by the Eighth Amendment's proscription against sentences that are disproportionate to the crime committed. *Ewing,* at 1186. *Harmelin* held that a life sentence without possibility of parole was not grossly disproportionate under the Eighth Amendment although the first time offender was convicted only of possessing 672 grams of cocaine and was not the subject of a recidivism statute. *Ewing,* at 1186. Based on this precedent, *Ewing* and *Lockyer* gleaned that its guiding principles for deciding whether a sentence of twenty-five years to life for stealing three golf clubs or videotapes required the threshold determination of whether the crime committed and the sentence imposed leads to an inference of gross disproportionality. *Ewing,* 538 U.S. at —— – ——, 123 S.Ct. at 1188–90. Neither contention of an Eighth Amendment violation survived the Court's threshold determinations and both enhanced sentences were upheld. *Id.* at 1190; *Lockyer,* 538 U.S. at —— – ——, 123 S.Ct. at 1175–76.

[¶ 31] In considering this precedent as well as our own established in *Oakley* and *Rich* with respect to the facts of this case, we first find that, contrary to his assertions, Daniel has been convicted of two distinct sexual assaults permitting imposition of consecutive life sentences under the habitual

---

**4.** *Ewing* noted that this principle applied to the death penalty, and that the success of capital

punishment proportionality challenges is not rare. *Ewing,* 538 U.S. at ——, 123 S.Ct. at 1185.

criminal statute. We have said that "[i]n appeals alleging imposition of multiple sentences for a single act, the focus is on those facts proven at trial." *Chapman v. State,* 2001 WY 25, ¶ 25, 18 P.3d 1164, ¶ 25 (Wyo. 2001) (citing *Rouse v. State,* 966 P.2d 967, 970 (Wyo.1998)). The ultimate question is whether those facts reveal a single criminal act or multiple distinct offenses against the victim. *Id.* Where the acts required for the commission of one offense are a necessary and indispensable precursor to commission of a second offense, the offenses merge for purposes of sentencing. *Id.* Such merger is mandatory where the second offense cannot be committed absent commission of the first offense. *Id.*

[¶ 32] The evidence showed that Daniel subjected the victim to both vaginal and anal sexual penetration and these acts constitute separate, forcible sexual intrusions on the victim. *See* Wyo. Stat. Ann. § 6–2–302 (LexisNexis 2003). Proof of different facts was required to establish the elements of each crime, creating a record showing that Daniel's convictions were for separate and distinct crimes. It was, therefore, appropriate for the district court to consider Daniel's convictions as separate and distinct crimes for the purpose of imposing consecutive life sentences pursuant to the habitual criminal statute.

[¶ 33] Daniel's Eighth Amendment violation claim requires that we examine the gravity of the offense compared to the harshness of the penalty. Daniel's two first degree sexual assault convictions followed a history of felony convictions. Wyoming's habitual criminal statute is long-standing and serves to address recidivism by simply removing from society those members who have proved themselves incapable of conforming to the laws by virtue of multiple, previous felony convictions. Our review of Wyoming legislation indicates that the habitual criminal statute, § 6–10–201, is directed at repeat offenders of violent crimes and § 6–2–306 imposes a life sentence for those

with two previous first degree sexual assault convictions. The sentence enhancement under the sexual assault statute does not apply to Daniel, but from this scheme, we see that the legislature enacted § 6–10–201 with the intent of removing from society those recidivists who continue to commit felonies and the legislature has further acted to incapacitate those recidivists with three first degree sexual assault convictions by imposing life sentences under § 6–2–306.

[¶ 34] Daniel, a felony recidivist, now stands convicted of two violent felonies as defined by Wyo. Stat. Ann. § 6–1–104(a)(xii) (LexisNexis 2003),[5] namely, first degree sexual assault, and, because of his criminal history, Daniel was properly subjected to a life sentence in furtherance of the legislative goal of halting recidivism. We hold that his two consecutive life sentences for his convictions is not a rare case where the crimes compared to the penalty are grossly disproportionate. No violation of the Eighth Amendment's ban against cruel and unusual punishment has occurred.

*Ineffective Assistance of Counsel.*

[¶ 35] Daniel compares the quality of his representation in the first trial that resulted in a hung jury and that quality in the second trial by the same trial counsel and contends that a variety of errors in both resulted in a failure to achieve an acquittal. He claims that after the verdict, trial counsel failed to present any argument to the jury or court on his behalf, thereby causing his habitual criminal conviction and immediate imposition of two consecutive life sentences. He also claims that his counsel interfered with his efforts to procure trial transcripts for an appeal in violation of rules of professional conduct. The State contends that defense counsel's decisions must be considered either sound trial strategy, within the range of professionally competent assistance, or lacking in prejudicial effect.

---

5. (a) As used in W.S. 6–1–101 through 6–10–203 unless otherwise defined:

 * * * *

 (xii) "Violent felony" means murder, manslaughter, kidnapping, sexual assault in the first or second degree, robbery, aggravated assault, aircraft hijacking, arson in the first or second degree or aggravated burglary[.]

[¶ 36] Our standards for reviewing ineffectiveness claims are well-established and require the dual showings that counsel's performance was deficient and that any deficiencies resulted in prejudice to the accused. *Miller v. State*, 942 P.2d 1108, 1109 (Wyo. 1997). Daniel's contention that it was ineffective assistance to permit his shackling during trial has been addressed and found to have been harmless error, and he cannot sustain his allegations of prejudice. He next addresses several errors that he categorizes as a failure to adequately investigate and establish his defense, first noting that that defense failed to present witnesses who could have supported Daniel's theory of consensual sexual intercourse.

[¶ 37] He claims that the victim returned to her home that evening and her boyfriend, who has a history of domestic violence against the victim, inflicted the injuries. He contends that an investigation should have been conducted to see if neighbors heard her return home that night and the boyfriend should have testified. Daniel concedes that he is conjecturing that this favorable testimony existed and, therefore, we do not further consider these contentions.

[¶ 38] Daniel next claims that counsel did not request a reasonable time for continuance between the first and second trials in order to gain time to subpoena witnesses helpful to the defense, obtain and review the victim witness' sworn and contradictory statements in writing, and otherwise fully and adequately prepare for the second trial. The two notably absent defense witnesses were a state crime lab expert, Reugotske, who testified in the first trial that the victim was likely intoxicated on that evening and related its possible effect on her memory of events, and the maintenance man, Mr. Beltran, for Daniel's apartment building, whose testimony about the layout and wall thickness of Daniel's apartment cast doubt on the victim's claims that she screamed for help and whose testimony noted the absence of headboards or footboards on Daniel's bed although the victim had claimed that she had been tied to them. An expert from the Wyoming Crime Lab, forensic chemist Kathryn Hollenbach, had testified for the de-

fense in the first trial that blood evidence suggested that a perpetrator other than Daniel existed. Both of these experts gave the same testimony at the second trial in the State's case-in-chief and were subject to cross-examination. These and other changes in the witness list cause Daniel to assert that these changes were the difference between the first trial resulting in a hung jury and the second trial resulting in conviction. The State contends that Reugotske's and Hollenbach's testimony remained just as advantageous to the defense; that Beltran's testimony was cumulative to photos and videotape of the apartment and one neighbor's testimony describing that she did hear the victim talking inside the apartment; and that the defense gained the additional advantage of cross-examining State experts to produce favorable evidence for the defense.

> We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of professionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. We do not evaluate the efforts of counsel from a perspective of hindsight but, rather, we endeavor to reconstruct the circumstances surrounding counsel's challenged conduct and evaluate the professional efforts from the perspective of counsel at the time. We invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment. The burden is upon the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be considered sound trial strategy.

*Dudley v. State*, 951 P.2d 1176, 1181 (Wyo. 1998) (citations and quotation marks omitted). Daniel has not met his burden of showing that the change in the defense counsel's witness list was deficient. We consider the changes to have been tactical decisions that are beyond our review, and we find that counsel did not act deficiently. *Id.*

[¶ 39] Daniel saves his harshest criticism for trial counsel's performance at the habitual criminal proceedings. Trial counsel was unable to persuade the trial judge not to proceed immediately on the evening that the jury returned its conviction, waived the defense's opening argument, did not stipulate to Daniel's prior convictions, and defendant did not testify although once his prior convictions were made known to the jury, no reason remained for Daniel not to testify. He further alleges that trial counsel failed to request a presentencing investigation report as required by W.R.Cr.P. 32(a), and failed to object to the harshness of imposition of two life sentences either at sentencing or afterwards. The record reflects that Daniel's assertions are correct; however, as the State argues, Daniel's waiver of his right to testify is on the record, and no prejudice occurred because, under the habitual criminal statute as we have just interpreted it, the trial court had no choice but to impose two life sentences.

[¶ 40] Finally, Daniel contends that trial counsel interfered with his efforts to secure the transcript from the court reporter by writing to the court that she had never ordered a complete set of trial transcripts. Daniel characterizes counsel's confession to failing to timely and properly prosecute his appeal as a breach of loyalty to him; however, as our next discussion indicates, the delay of appeal was not prejudicial, and we do not find that trial counsel's deficiencies in this respect prejudiced him.

*Delay of Appeal*

[¶ 41] Daniel filed his notice of appeal in September of 1999 and ordered a transcript of the report of proceedings. Defense counsel approved several extensions requested by the court reporter but, after learning that motions hearings and transcripts of the first trial had not been reported, moved to have a new trial granted for an insufficient record. These motions were denied, and Daniel contends that the almost thirty-one month delay denied his right to a speedy appeal in violation of his right to due process guaranteed by Art. 1, § 6 of the Wyoming Constitution and the Fifth and Fourteenth Amendments of the United States Constitution, and requires reversal of his convictions and dismissal of the charges against him.

[¶ 42] The United States Constitution does not require the states to provide convicted defendants a right to appellate review. *Harris v. Champion*, 15 F.3d 1538, 1558 (10th Cir.1994); *Rheuark v. Shaw*, 628 F.2d 297, 302 (5th Cir.1980). While the right to a speedy appeal is not contemplated in the Sixth Amendment, federal courts have held that undue delay in processing an appeal may rise to the level of a violation of due process. *See, e.g., United States v. Smith*, 94 F.3d 204, 206–07 (6th Cir.1996); *United States v. Hawkins*, 78 F.3d 348, 350 (8th Cir.1996); *United States v. Luciano–Mosquera*, 63 F.3d 1142, 1158 (1st Cir.1995); *Harris*, 15 F.3d at 1557; *United States v. Antoine*, 906 F.2d 1379, 1382 (9th Cir.1990); *Simmons v. Reynolds*, 898 F.2d 865, 868 (2d Cir.1990); *Rheuark*, 628 F.2d at 302; *see also Evitts v. Lucey*, 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985) (if state has created appellate courts as integral part of system for adjudicating guilt or innocence, procedures used in deciding appeals must comport with demands of due process and equal protection).

[¶ 43] To determine whether an inordinate delay denies due process, most courts have adopted a modified version of the test formulated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), analogizing to the violation of speedy trial rights. *Harris*, 15 F.3d at 1558–59; *Rheuark*, 628 F.2d at 303; *Allen v. State*, 686 N.E.2d 760, 783 (Ind.1997). The four-prong test examines the length of the delay, the reason for the delay, the defendant's diligence in pursuing the right to appeal, and the prejudice to the defendant. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192; *Coe v. Thurman*, 922 F.2d 528, 531–32 (9th Cir.1990); *Rheuark*, 628 F.2d at 303 n. 8. The length of the delay acts as a triggering mechanism, meaning that unless the delay is unreasonable under the circumstances, there is no necessity to inquire further. *Doggett v. United States*, 505 U.S. 647, 651–52, 112 S.Ct. 2686, 2690–91, 120 L.Ed.2d 520 (1992);

*Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. In extreme circumstances, an inordinate delay may give rise to a presumption of prejudice. *Doggett,* 505 U.S. at 655–57, 112 S.Ct. at 2692–93 (cited in *Smith,* 94 F.3d at 209).

[¶ 44] The courts have recognized that an appeal that is inordinately delayed is as much a "meaningless ritual" as an appeal that is adjudicated without the benefit of effective counsel or a transcript of the trial court proceedings. *Smith,* 94 F.3d at 207 (quoting *Harris,* 15 F.3d at 1558). Among the circumstances that can lead to a deprivation of due process are excessive delays in furnishing transcripts to be used on appeal. *Luciano–Mosquera,* 63 F.3d at 1158; *DeLancy v. Caldwell,* 741 F.2d 1246 (10th Cir. 1984); *Rheuark,* 628 F.2d at 302. If the threshold showing of inordinate delay is not established, it is generally unnecessary to inquire into the remaining *Barker* factors. *Harris,* 15 F.3d at 1559–60. The fourth *Barker* factor, prejudice, is to be assessed in light of the interests that the right to a speedy disposition of an appeal is intended to protect. These interests are: (1) preventing oppressive incarceration pending appeal; (2) minimizing anxiety and concern of a convicted person awaiting the outcome of an appeal; and (3) limiting the possibility that the grounds for appeal or defenses in case of reversal and retrial might be impaired. *Harris,* 15 F.3d at 1559; *Rheuark,* 628 F.2d at 303 n. 8.

[¶ 45] We agree with the federal courts that an excessive delay in the resolution of an appeal, other than appeals involving the unusual circumstances of capital crime, can give rise to a cognizable claim of denial of due process. We further conclude that the factors set forth in *Barker,* as adapted by *Harris* and *Rheuark,* are appropriate for evaluating such claims. Applying these factors here, we perceive no due process violation in the resolution of defendant's appeal.

[¶ 46] As Daniel points out, the time for resolution of his appeal will exceed three years. The amount of time involved in preparing and transmitting the record was longer than it should have been and does reach the levels that have been considered excessive or inordinate for purposes of assessing whether a due process violation has occurred. *See DeLancy,* 741 F.2d at 1248 (court reporter's three-year refusal to provide transcript could support defendant's claim for damages under 42 U.S.C. § 1983 if application of Barker factors established a due process violation); *Luciano–Mosquera,* 63 F.3d at 1158 (although reporter's failure to provide transcripts for nearly two years was a significant delay, defendant suffered no prejudice and thus did not establish due process violation); *Rheuark,* 628 F.2d at 302–03 (court would assume without deciding that delay of nearly two years in preparation of transcript exceeded the limits of due process).

[¶ 47] The total time for resolving defendant's appeal rises to the level of "inordinate delay" that has been recognized as necessitating inquiry into the remaining *Barker* factors. *See Simmons,* 898 F.2d at 868 (six-year delay in resolving appeal, resulting in significant prejudice to defendant, deprived him of his due process right to a speedy appeal); *Hawkins,* 78 F.3d at 351–52 (four-year delay by clerk's office in processing appeal was inordinate, but defendant's due process rights were not violated because he was not prejudiced by the delay); *Smith,* 94 F.3d at 207–08 (three-year delay in resolving appeal was sufficient to require inquiry into additional *Barker* factors); *Harris,* 15 F.3d at 1560 (delay beyond two years in adjudicating direct criminal appeal is presumptively excessive, thus requiring consideration of additional factors).

[¶ 48] We see inordinate delay here, and the State concedes that we should follow *Harris v. Champion,* and presume that the delay was excessive, and thus, consider the remaining *Barker* factors. In regard to the second *Barker* factor—the reason for the delay—we note that at least some of the delay was attributable to defendant's amendment of his original designation of record and his supplemental designation of an additional transcript some nine months after the original designation; however, we will not decide today whether delay caused by a court reporter and a court-appointed attorney shall weigh against a defendant. Considering the third *Barker* factor, we conclude that defen-

dant timely asserted his right to a speedy appeal, having raised the issue during the course of his attempts to obtain the transcripts. However, defendant is unable to show prejudice resulting from the delay, the fourth *Barker* factor, and thus cannot establish a due process violation. *See Hawkins,* 78 F.3d at 351–52; *Luciano–Mosquera,* 63 F.3d at 1158.

[¶ 49] Incarceration is not "oppressive" and thus does not support a claim of prejudice under *Barker,* if the absence of a meritorious appeal establishes that the defendant is rightfully incarcerated. *See Hawkins,* 78 F.3d at 351. Here, Daniel has not established any basis for reversal of his conviction or reduction of his two consecutive life sentences prison term. He is thus rightfully incarcerated, and there will be no retrial at which potential defenses might have been compromised by the delay. Finally, defendant does not establish that he has suffered anxiety or concern beyond that normally accompanying a pending appeal. Daniel's claim fails because we find that he suffered no prejudice and, in these circumstances, any delay in the resolution of his appeal has not violated his right to due process. *People v. Rios,* 43 P.3d 726, 733–34 (Colo.App.2001).

[¶ 50] Finding no error, the order of conviction and sentence is affirmed.