2005 WY 78

**Rehan BHUTTO, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 04–89.**

Supreme Court of Wyoming.

July 13, 2005.

Representing Appellant: Kenneth Koski, Public Defender; Donna Domonkos, Appellate Counsel; and Megan L. Hayes.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Dee Morgan, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶1] The appellant was convicted of premeditated first-degree murder for killing Valerie McCarthy. The appellant raises numerous issues concerning the proceedings that led to his conviction, the constitutionality of the sentence imposed upon him, and the delay in docketing this appeal. We affirm.

## ISSUES

1. Did the district court err in not suppressing statements the appellant made to law enforcement officers?

2. Did the district court err in admitting certain uncharged misconduct evidence?

3. Did the district court err in admitting certain photographs into evidence?

4. Did cumulative error occur?

5. Is the life imprisonment without parole provision of Wyo. Stat. Ann. § 6–2–101(c) (LexisNexis 2003) unconstitutional?

6. Did delay in docketing this appeal deprive the appellant of his right to meaningful appellate review?

## FACTS

[¶ 2] At about 6:15 a.m., on April 25, 2001, Casper police officers responding to appellant's 911 emergency call found Valerie McCarthy dead on the couple's bed.[1] She had been shot in the head, and a pistol was found underneath a pillow on the bed. The appellant told the officers that he had last seen Ms. McCarthy when she went to bed around 9:00 the previous evening. He stated that he had fallen asleep on the couch watching television, and that he had discovered Ms. McCarthy in the morning after showering and getting ready for work. He then called 911 and told the police that Ms. McCarthy had committed suicide.

[¶ 3] At approximately 7:00 a.m., the appellant agreed to accompany the officers to the police station. Once there, he waited in an interview room for investigators to arrive. Detective Dietz began interviewing the appellant at about 7:40 a.m., after telling the appellant that he was not in custody and was free to leave. Detective Kirkendall joined the interview at 8:00 a.m. During the interview, the appellant stated his belief that Ms. McCarthy was "involved" with someone else. This statement, coupled with information from the crime scene, led the detectives to

believe that the appellant may have killed Ms. McCarthy. Consequently, at about 9:15 a.m., they advised him of his *Miranda* rights.[2]

[¶ 4] Despite being "Mirandized," the appellant indicated his willingness to continue talking to the detectives. In fact, he interrupted the advisement of his rights to say, "let me finish this first, I want to tell you about this." He then continued to discuss with the detectives his relationship with Ms. McCarthy and a timetable of recent events. When the detectives informed him around 10:00 a.m. that the evidence in the case did not seem to support what he was telling them, the appellant replied, "I will pay elsewhere, I'll pay with my God." In a statement that Detective Dietz characterized as being "a little out of context," the appellant then said that Ms. McCarthy put the pistol under her pillow to protect herself because she was afraid of him.

[¶ 5] The detectives attempted to follow up on their interview with the appellant by asking him specific questions. After several minutes of what Detective Dietz later described as the appellant answering questions with questions and trying to lead the interview in different directions, the appellant stated, "I think I want my attorney here now." Upon clarifying that this was an unequivocal request for counsel, the detectives ceased the interrogation. However, the appellant asked the detectives how he could recontact them if he changed his mind. In response, Detective Kirkendall gave the appellant a "re-initiation of contact" form.

[¶ 6] Detectives Dietz and Kirkendall left to conduct further investigation, including interviews and the preparation of search warrant affidavits, one of the latter intended to obtain a warrant to search the appellant's person for evidence. The appellant remained in the interview room, now under the supervision of Detective Freel, with whom the appellant was personally acquainted. Knowing of the appellant's request for coun-

---

1. Ms. McCarthy is alternatively described in the parties' briefs as the appellant's "wife" or "girlfriend." The two were married in a religious ceremony, but did not obtain a civil marriage certificate.

2. *Miranda v. Arizona*, 384 U.S. 436, 474–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

sel, Detective Freel did not question the appellant. However, while the detective was escorting the appellant to the restroom, the appellant asked what he should do, and Detective Freel responded that he could not give him legal advice, but the appellant should tell the detectives the truth. When the appellant told Detective Freel that is what he wanted to do, the detective went and informed Detectives Dietz and Kirkendall of that fact. The latter two then went back into the interview room, but left without further questioning the appellant because he would not sign the form to re-initiate contact.

[¶ 7] Soon after the aborted re-contact, the appellant asked for another restroom break. Detective Freel again responded, and the appellant again asked what he should do. Detective Freel pointed out the failed re-contact and asked what the appellant would like him to do. The appellant said that he did not trust the other detectives, but that he would like to talk to Detective Freel. Detective Freel then obtained a tape recorder, another re-contact form, and a *Miranda*-rights form. What followed was a two-hour interview, during which the appellant admitted killing Ms. McCarthy because of her disclosure of unfaithfulness.

[¶ 8] Additional facts will be noted as they pertain to particular issues.

## DISCUSSION

### Motion to Suppress

[¶ 9] The appellant remained in the police station interview room from approximately 7:00 a.m. to 4:30 p.m., with only a few restroom breaks. He was not provided with lunch, and he complained frequently of a headache. The officers testified that, although the appellant had voluntarily accompanied them to the station, he was not free to leave after his constitutional rights were explained to him at about 9:15 a.m. He requested counsel an hour later, and the interview ended. The appellant was not allowed to leave, however, and, after signing a re-contact form, he eventually confessed to killing Ms. McCarthy.

[¶ 10] With these facts in mind, the appellant filed a pretrial motion to suppress his statement to Detective Freel. The district court heard that and other motions on August 31 and September 4, 2001. The motion was denied. In its decision letter, the district court identified three issues surrounding the April 25th statement: (1) whether the statement was obtained during custodial interrogation; (2) whether the statement was voluntary; and (3) whether the appellant re-initiated contact with the detectives after requesting counsel.

[¶ 11] We set forth our standard for reviewing the denial of a motion to suppress as it concerns these issues in *Gunn v. State*, 2003 WY 24, ¶¶ 5–12, 64 P.3d 716, 719–21 (Wyo.2003):

" 'When we review a district court's ruling on a motion to suppress evidence, we do not interfere with the findings of fact unless they are clearly erroneous. When the district court has not made specific findings of fact, we will uphold its general ruling if the ruling is supportable by any reasonable view of the evidence. We consider the evidence in the light most favorable to the district court's ruling because of the district court's ability to assess "the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions" at the hearing on the motion.' "

*Meek v. State*, 2002 WY 1, ¶ 8, 37 P.3d 1279, 1282 (Wyo.2002) (*quoting Frederick v. State*, 981 P.2d 494, 497 (Wyo.1999)). Voluntariness, however, is a question of law; thus, it is reviewed *de novo*. *Lewis v. State*, 2002 WY 92, ¶ 18, 48 P.3d 1063, 1068 (Wyo.2002).

. . .

Statements made by a suspect during custodial interrogation are admissible into evidence, providing certain advisements are made. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements made during custodial interrogation must be excluded upon a showing that the defendant was not advised of his *Miranda* rights. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), *cert. denied*, 535 U.S. 1106, 122 S.Ct. 2315, 152 L.Ed.2d

1069 (2002). In *Dickerson*, 530 U.S. at 435, 120 S.Ct. 2326, the United States Supreme Court stated:

"Accordingly, we laid down 'concrete constitutional guidelines for law enforcement agencies and courts to follow.' ... Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as '*Miranda* rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'"

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. *See also Glass v. State*, 853 P.2d 972, 976 (Wyo. 1993) and *Wunder v. State*, 705 P.2d 333, 334 (Wyo.1985). Neither general on-the-scene questioning as to facts surrounding a crime nor statements volunteered freely without compelling influences are considered to fall within this definition. *Miranda*, 384 U.S. at 477–78, 86 S.Ct. 1602.

The totality of the circumstances must be considered in determining whether a suspect is in custody when questioned. In *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the United States Supreme Court rejected the notion that a person who is the "focus" of a criminal investigation is, by that fact, "in custody." The United States Supreme Court made clear that *"Miranda* implicitly defined 'focus,' for its purposes, as 'questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.* at 347, 96 S.Ct. 1612 (*quoting Miranda*, 384 U.S. at 444, 86 S.Ct. 1602) (emphasis in original). The proper inquiry is to ask "whether a reasonable man in Appellant's position would have considered himself to be in police custody." *Glass*, 853 P.2d at 976.

Several factors are relevant to be considered in determining whether a restraint is "custodial" for *Miranda* purposes. Among these are: (1) whether a suspect is questioned in familiar or neutral surroundings; (2) the number of police officers present; (3) the degree of physical restraint and whether it is comparable to those associated with a formal arrest; and (4) the duration and character of the interrogation. *See* 2 Wayne R. LaFave, Jerold H. Israel and Nancy J. King, *Criminal Procedure* § 6.6(c) at 527 (2nd ed.1999); *see also Wunder*, 705 P.2d at 335. The nature of the interrogator, the nature of the suspect, the time and place of the interrogation, the progress of the investigation at the time of the interrogation, whether the suspect is informed that his detention would not be temporary, and the elapsed amount of time between questioning and the arrest may be important factors as well. *Wunder*, 705 P.2d at 335; J.F. Ghent, Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring that Suspect be Informed of His Federal Constitutional Rights Before Custodial Interrogation*, 31 A.L.R.3d 565 (1970). No one factor alone will necessarily establish custody for *Miranda* purposes, and not all factors will be relevant to a given case.

The giving of *Miranda* warnings, by itself, does not suffice to render a statement admissible. The Fifth and Fourteenth Amendments to the United States Constitution, and Wyo. Const. art. 1, §§ 6 and 11, require that statements also must be voluntary. *Lewis*, 2002 WY 92, ¶ 18, 48 P.3d at 1068; *Mitchell v. State*, 982 P.2d 717, 721 (Wyo.1999); *Doyle v. State*, 954 P.2d 969, 971–72 (Wyo.1998).

"'To be voluntary, the defendant's statements must result from "free and deliberate choice rather than intimidation, coercion, or deception." *Madrid v. State*, 910 P.2d 1340, 1344 (Wyo.1996). Because we presume a defendant's

statements to be involuntary, the burden rests on the State to show, by a preponderance of the evidence, that the defendant's statements were voluntary. [*State v.*] *Evans,* 944 P.2d [1120] at 1126–27 [ (Wyo.1997) ]. Once the State has met its burden and rebutted the presumption of involuntariness, the defendant may be required to present evidence demonstrating the involuntariness of his statements. *Id.* at 1126. If such statements resulted from coercion, then the statements are inadmissible at trial for any purpose because their validity is suspect. *Id.* at 1125.'"

*Lewis,* 2002 WY 92, ¶ 18, 48 P.3d at 1068 (*quoting Mitchell,* 982 P.2d at 721). We look to the totality of the circumstances to determine if the defendant's statements were voluntary. *Lewis,* 2002 WY 92, ¶ 18, 48 P.3d at 1068 (*quoting Mitchell,* 982 P.2d at 721).

Factors a trial court may consider in determining whether statements were made voluntarily include:

"[T]he atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made[,] ... whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the *method and style* employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately *prior to and during* the interrogation, as well as educational back-

ground, employment status, and prior experience with law enforcement and the criminal justice system.'"

*Simmers v. State,* 943 P.2d 1189, 1195–96 (Wyo.1997) (*quoting State v. Evans,* 944 P.2d 1120, 1125–26 (Wyo.1997); *People v. Gennings,* 808 P.2d 839, 845 (Colo.1991); and *People v. Pearson,* 725 P.2d 782, 783 (Colo.1986)).

[¶ 12] Two inquiries are required in determining whether an accused was in custody during an interrogation: first, what were the circumstances, and second, would a reasonable person have felt at liberty to terminate the interrogation and leave. *Kolb v. State,* 930 P.2d 1238, 1243 (Wyo.1996). The fact of custody is not determined by the subjective intent of the law enforcement officer, or the subjective belief of the accused.

An officer testified that he felt that, after the marijuana was found, Appellant was not free to leave; however, he never told Appellant that he was not free to leave, nor did he hear anyone else tell Appellant that he was not free to leave. "'A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'" *Wunder [v. State],* 705 P.2d [333] at 335 [ (Wyo.1985) ] (*quoting Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).

"'"It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning."' ... *United States v. Caiello,* 420 F.2d 471, 473 (C.A.2 1969) [, *cert. denied,* 397 U.S. 1039 [90 S.Ct. 1358, 25 L.Ed.2d 650] (1970) ] [A]n objective, reasonable-man test is appropriate because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncra-

sies of every person whom they question[.' *People v. P.*, 21 N.Y.2d 1, 286 N.Y.S.2d 225, 230, 233 N.E.2d 255, 260 (N.Y.1967).]"

*Id.* (*quoting Berkemer*, 468 U.S. at 442 n. 35, 104 S.Ct. at 3151 n. 35).

*Southworth v. State*, 913 P.2d 444, 450–51 (Wyo.1996). The giving of *Miranda* rights may be indicative of, but is not necessarily determinative of, custodial interrogation. *Eckenrod v. State*, 2003 WY 51, ¶ 20, 67 P.3d 635, 641 (Wyo.2003).

[¶ 13] In its decision letter in the instant case, the district court began its analysis of these issues by quoting a portion of the following passage from *Houghton v. State*, 6 P.3d 643, 648 (Wyo.2000):

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that an accused person in custody who has expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication with the police. 451 U.S. at 484–85, 101 S.Ct. at 1885. The Court further held that when an accused has invoked his Fifth Amendment right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. 451 U.S. at 484, 101 S.Ct. at 1885.

[¶ 14] The district court then noted several circumstances leading to its conclusion that the appellant was not in custody during the interview with Detective Freel on April 25th: (1) the appellant voluntarily went to the police station upon request; (2) he was told at the outset of the interview that he was free to leave; (3) he was never formally arrested, handcuffed, or incarcerated; (4) he never asked to leave; and (5) he was watched by the officers because of a pending warrant for the search of his person. While we agree that these circumstances existed, and giving due deference to the district court's findings of fact in this regard, we are forced to conclude that, under the totality of the circumstances, a reasonable person in the appellant's situation would not have felt at liberty to leave.

■ [¶ 15] The appellant arrived at the police station voluntarily early in the morning. After a couple of hours of questioning, he was given his *Miranda* warnings. Although their subjective intent is not controlling, it should be noted that Detectives Dietz, Kirkendall and Freel all consider the appellant to have been in custody from that point forward.[3] From mid-morning until he was formally arrested late in the afternoon, the appellant was not allowed to leave the interview room unescorted, he was not allowed to have contact with third persons, and he was not allowed out of the eyesight of a law enforcement officer. To gain attention, he had to knock on the closed door of the interview room and wait for an officer's response. Despite the fact that no officer had directly told the appellant that he was no longer free to go, the situation had changed to such a degree that it must have been obvious to everyone, including the appellant, that he could not leave. The appellant was, in fact, in custody. Because "custody" requires only that an accused be " 'deprived of his freedom of action in any significant way,' " being placed in "custody" for *Miranda* purposes can occur before actual arrest. *Martinez v. State*, 943 P.2d 1178, 1181 (Wyo.1997) (*quoting Southworth*, 913 P.2d at 449); *Eckenrod*, 2003 WY 51, ¶ 20, 67 P.3d at 641.

[¶ 16] The determination that the appellant was in custody during the interrogation by Detective Freel on April 25th does little, however, to answer the questions before this Court. No issue exists as to the necessity of *giving* the *Miranda* warnings because the appellant does not deny that he was Mirandized twice before that interview nor does he

---

3. The fact of custody is determined under an objective standard to avoid the self-serving statements of the participants. One fear is that officers might describe truly custodial situations as non-custodial. That has not happened here, where the officers all agree appellant was in custody.

challenge the sufficiency of those advisements. The relevance of the custody factor, therefore, is limited to its role in determining the voluntariness of the appellant's statements, and his initiation of re-contact with the detectives.

 [¶ 17] The two-part test for determining the validity of an accused's statement to law enforcement officials after he has requested counsel is to inquire, first, whether he initiated the contact, and second, whether, under the totality of the circumstances, he waived his right against self-incrimination. *Wells v. State*, 846 P.2d 589, 594 (Wyo.1992). The district court found that the appellant voluntarily initiated the re-contact with the detectives that resulted in the statement he gave Detective Freel. We agree. Not once, but twice, the appellant approached Detective Freel with questions as to what he should do. Those contacts were "initiated" by the appellant, as that word is ordinarily understood. *See Wells*, 846 P.2d at 594.[4] There is no suggestion in the record that any of the detectives, or any other law enforcement officials, spoke to or questioned the appellant after he requested counsel. In fact, the appellant's first attempt to initiate re-contact with the detectives failed because Detectives Dietz and Kirkendall would not speak with him unless he signed a Request for Contact Form, which he was reluctant to do. His refusal to speak to those detectives shows that he was aware that silence was an option. Furthermore, Detective Freel did not agree to the later interview with the appellant until he had once again advised him of his *Miranda* rights, and the appellant had read and signed the Request for Contact Form, which contained the following language:

> I Rehan Bhutto, DID/DO HEREBY REQUEST THAT DETECTIVE[ ] FREEL COME TO THE 201 N. DAVID ST. FOR THE PURPOSE OF INTERVIEWING ME IN REGARDS TO A CRIMINAL INVESTIGATION FOR WHICH I WAS INVOLVED IN OR HAVE PERSONAL KNOWLEDGE OF …

> I DO THIS OF MY OWN FREE WILL WITHOUT COUNSEL BEING PRESENT. NO PROMISES HAVE BEEN MADE TO ME FOR LENIENCY IN EXCHANGE FOR MY STATEMENT OR COOPERATION IN THE CASE …
> I FULLY UNDERSTAND THE ABOVE CONDITIONS AND THAT IT WAS *I* THAT INITIATED THE CONTACT WITH DETECTIVES …

[¶ 18] The evidence is clear that the appellant, not the detectives, initiated the contact that led to his confession. The remaining question is whether that contact was a voluntary waiver of his right against self-incrimination. We have already herein delineated the factors that are to be considered in determining voluntariness. Having reviewed the entire record, and having considered the applicable factors, we agree with the district court's succinct analysis and conclusion that the appellant's statements to Detective Freel were voluntarily made:

> Finally, the Court would find that the statement given by the Defendant to Detective Freel on April 25th was voluntarily given. While the Defendant did complain of a headache, it cannot be said that his physical condition was such to conclude that the statement was involuntarily given. *Jansen v. State*, 892 P.2d 1131, 1140 (Wyo. 1995). The testimony presented in the case at hand unanimously supports the findings that the Defendant, during the time in question, was oriented to time and place, responsive to inquiries made of him, and able to clearly express himself. It must also be noted that in the almost two hours that he talked with Detective Freel, the Defendant clearly communicated his desire to talk and discuss the matters at issue without any reservation on his part. Therefore, given the totality of the circumstances, there can be no question but that the prosecution met its burden of proving by a preponderance of the evidence that the Defendant's statement to Detective Freel on April 25, 2001, was given voluntarily. *State v. Evans*, 944 P.2d 1120, 1127 (Wyo.1997).

---

**4.** "Initiate" means "to cause or facilitate the beginning of: set going…." Merriam–Webster's Ninth New Collegiate Dictionary 622 (9th ed.1986).

We would add only that, under the totality of the circumstances, the appellant's confinement to the interview room for the better part of the day was for legitimate purposes during a murder investigation, was minimally intrusive given the situation, and cannot be characterized as " 'coercive state action, such as trickery, psychological pressure, or mistreatment.' " *State v. Evans*, 944 P.2d 1120, 1125 (Wyo.1997) (*quoting Withrow v. Williams*, 507 U.S. 680, 708, 113 S.Ct. 1745, 1762, 123 L.Ed.2d 407 (1993) (O'Connor, J., concurring)). Neither can it be said that the appellant's "will was overborne by the police and that [his] capacity for self-determination was seriously impaired." *Evans*, 944 P.2d at 1125.

### Uncharged Misconduct Evidence

 [¶ 19] The admissibility of what has come to be called uncharged misconduct evidence is determined under W.R.E. 404(b):

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Such evidence is also subject to the mandates of W.R.E. 402 and 403 that it be relevant and that its probative value not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." W.R.E. 403. Because uncharged misconduct evidence may be admitted only for these limited purposes, this Court has adopted a stringent test for determining admissibility. *See Gleason v. State*, 2002 WY 161, ¶¶ 16–18, 26–33, 57 P.3d 332, 339–40, 342–44 (Wyo.2002). Admissibility

determinations are reviewed for an abuse of discretion. *Id.* at ¶ 18, 57 P.3d at 340.

 [¶ 20] The specific evidence to which the appellant objected in the district court and which is the subject of this appellate issue consisted of the testimony of seven people describing various incidents of threats and violence between the appellant and Ms. McCarthy during the six-year period prior to her death.[5] It is the appellant's contention that these incidents were too remote in time to be relevant to any matter at issue in the present case, and that the evidence was, therefore, substantially more prejudicial than probative.

[¶ 21] Prior to trial, the appellant filed a demand for notice of the State's intent to introduce evidence under W.R.E. 404(b). In its response, the State identified the witnesses who eventually testified at trial, as well as other potential "404(b)" witnesses, and specified proof of motive, intent, malice, and lack of accident as justification for the testimony. The matter was heard along with other pretrial motions. The appellant challenged the proffered evidence on three grounds: that it was too remote in time, that it was uncorroborated, and that the witnesses were biased against him. The State's position was that the evidence tended to prove a pattern in the relationship between the appellant and Ms. McCarthy, that the incidents were not too remote in time to be relevant, and that they specifically tended to prove intent, motive, malice, and lack of accident.

[¶ 22] The district court ruled from the bench at the motion hearing, allowing the State to introduce the uncharged misconduct evidence now at issue. The district court found the evidence to be probative of motive, intent, malice, and lack of accident. It also held that the relationship between the appellant and Ms. McCarthy was relevant, and

---

5. Michael Concepcion testified that on April 17, 1997, he overheard Ms. McCarthy tell the appellant, "this is the last time you'll hit me," and that he observed Ms. McCarthy to have a bloodied, swollen lip. Michael McCarthy and Trisha McCarthy testified that the appellant physically assaulted Ms. McCarthy in Texas in 1995. Cheryl McFarland testified that on April 9, 1999, the appellant physically assaulted Ms. McCarthy by "slapp[ing] her around," and that sometime in 1994 she overheard the appellant threaten to kill Ms. McCarthy if he ever "caught her with someone else." Heather Frisby testified to a violent incident "three or four years ago." Angel Wheeler testified that on Halloween of 1998, she witnessed the appellant drag Ms. McCarthy out of a bar. Cynthia Burton testified that "three or four years ago" she witnessed the appellant shove and be physically abusive toward Ms. McCarthy.

that none of the alleged incidents of prior violence was so remote in time as to lose its relevance. Finally, the district court concluded that the probative value of the evidence was not outweighed by any danger of unfair prejudice.

[¶ 23] In this appeal, the appellant argues that the alleged prior acts of domestic abuse were remote in time and were dissimilar to the alleged crime, thereby rendering them more unfairly prejudicial than probative. In response, the State contends that the defense at trial was not "I didn't do it," but was that the appellant was guilty only of manslaughter. Consequently, questions of motive, malice, intent and lack of accident had to be resolved by the jury, making the evidence relevant.

[¶ 24] We agree with the district court that the State's uncharged misconduct evidence was admissible. Evidence of prior threats and assaults may be admissible to prove motive and intent. *Longfellow v. State*, 803 P.2d 848, 853 (Wyo.1990); *Smizer v. State*, 752 P.2d 406, 409–10 (Wyo.1988); *Cutbirth v. State*, 751 P.2d 1257, 1264 (Wyo. 1988). As the district court held, such evidence may also be admissible because it helps the jury understand the relationship between the parties. *Solis v. State*, 981 P.2d 28, 31 (Wyo.1999). Likewise, evidence of prior abuse may be admissible to counter a defense, such as accident or lack of intent. *Kenyon v. State*, 2004 WY 100, ¶ 24, 96 P.3d 1016, 1026 (Wyo.2004), *cert. denied*, — U.S. —, 125 S.Ct. 1389, 161 L.Ed.2d 158 (2005). Therefore, the evidence was offered for a proper purpose.

[¶ 25] As to remoteness in time, this Court has repeatedly refused to set a particular time limit for uncharged misconduct evidence, has said that the matter is left to the discretion of the trial court, and has said that remoteness affects weight rather than admissibility. *Hart v. State*, 2002 WY 163, ¶ 23, 57 P.3d 348, 356 (Wyo.2002); *Griswold v. State*, 994 P.2d 920, 926 (Wyo.1999); *Lonquest v. State*, 495 P.2d 575, 583 (Wyo.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972). The standard is reasonableness, considering the context of, and the theory supporting admission of, the evidence. *Hart*, 2002 WY 163, ¶ 24, 57 P.3d at 356.

[¶ 26] We conclude that the district court did not abuse its discretion in admitting the challenged evidence. The alleged incidents were all within five or six years of the charged crime, which period of time is not unreasonable under the circumstances, and is, indeed, much shorter than others that have been allowed. *See Hart*, 2002 WY 163, ¶ 19, 57 P.3d at 355 (28–29 years); *Griswold*, 994 P.2d at 926 (16–17 years); and *Britton v. State*, 845 P.2d 1374, 1376 (Wyo.1992) (8–13 years). And finally, the district court appropriately instructed the jury as to the limited purposes for which the evidence was admitted.[6]

[¶ 27] We will affirm the district court's admission of the challenged uncharged misconduct evidence because the district court followed the appropriate procedures in determining its admissibility, because the district court considered the appropriate factors in reaching its decision, and because the record sufficiently evidences that process.

### Photographs

[¶ 28] Numerous photographs were taken during the investigation into Ms. McCarthy's death. Prior to trial, the appellant filed a

---

6. Instruction No. 25 stated:

Generally, evidence of a person's character or a trait of his character may not be used to prove that he acted in conformity with his trait or character on a particular occasion. Likewise, evidence of prior wrongs or acts may not be used to show that a person has a particular character or that he acted in conformity with such character.

The Court has admitted the testimony of Jason Ujvary, William MacFarland, Cheryl MacFarland, Duanne Swanson, Trish MacFarland, Mike McCarthy, Mike Concepcion, Tanya Buss, Rob Frisby, Heather Frisby, Angel Wheeler, Cynthia Burton, and Amy Herman regarding prior wrongs or acts alleged to have been committed by the Defendant for the limited purpose of establishing motive, intent, preparation, plan or knowledge, and not at all to show that the Defendant acted in conformity with a particular character trait on any particular occasion.

You must not consider this evidence for any purpose except the limited purpose or purposes for which it was admitted as set forth in this instruction.

motion in limine seeking to prevent the State from introducing into evidence photographs of Ms. McCarthy's body at the scene or during autopsy. When the motion was heard, the appellant took the position that, understanding the need for a limited number of photographs showing manner and cause of death, the district court should exercise its discretion to prevent the unduly prejudicial effect of a presentation of cumulative gruesome photographs. The State contended that the photographs were necessary to prove such things as premeditation and malice, that they were necessary adjuncts to certain testimony, and that physical evidence such as photographs convey more information than words alone. The district court denied the motion in limine, leaving it to defense counsel to object at trial to proferred exhibits.

■■■■■■ [¶ 29] The question of whether to admit photographs into evidence, like other evidentiary decisions, is left to the reasonable discretion of the trial court. *Wilks v. State*, 2002 WY 100, ¶ 13, 49 P.3d 975, 982 (Wyo.2002) (*quoting Reeder v. State*, 515 P.2d 969, 972 (Wyo.1973)); *Barnes v. State*, 858 P.2d 522, 527 (Wyo.1993). That discretion is not, however, unguided. To be admissible, photographs, like other evidence, must be relevant and probative. W.R.E. 401, 402; *Barnes*, 858 P.2d at 526; *Reeder*, 515 P.2d at 972. Further, even relevant photographs may be excluded if their probative value is outweighed by the danger of unfair prejudice. W.R.E. 403; *Barnes*, 858 P.2d at 526–27. The appellant bears the burden of establishing an abuse of discretion in the admission of photographs. *Barnes*, 858 P.2d at 527. The trial court's decision is entitled to considerable deference and will not be reversed if there is any legitimate basis for the ruling. *Id.* Furthermore, we have recognized that photographs may have special significance in assisting juries to reach tough decisions:

Appellant's position is that, conceding the nature, extent and severity of the injuries as necessary and relevant, the patholo-

gist could orally testify to facts that would describe the injuries sufficiently for the jury to comprehend their magnitude. We trust juries to decide cases involving gory, gruesome killings and decide questions of life and death. It is inconsistent that we must sanitize the case by withholding fair evidence of the crime and its results. It was said that "a photograph is worth a thousand words," and we know that is so. The photographs are admissible for that reason in this case and in all cases in which the injuries have special significance and can be more readily perceived, understood and known by use of photographs or visual aids than if conveyed by words alone. To state in words that an abrasion is 15 centimeters in diameter or a bruise is black and blue cannot adequately convey to the jury a comprehension and knowledge of the degree and kind of actual abrasion or bruise.

*Id.* at 528.

■■■■■■ [¶ 30] In the instant case, the appellant conceded the manner and cause of death—he admitted that he shot Ms. McCarthy in the head. We have said, however, that such admissions do not make relevant photographs inadmissible. *Id.* at 526; *Seyle v. State*, 584 P.2d 1081, 1084 (Wyo.1978). That is because, despite any admissions, the State still has the burden of proving all the elements of the crime. *Wilks*, 2002 WY 100, ¶ 13, 49 P.3d at 983. In that regard, photographs depicting the nature and extent of injuries may be relevant to issues such as motive, intent, malice, and premeditation. *Campbell v. State*, 999 P.2d 649, 663 (Wyo. 2000); *Barnes*, 858 P.2d at 529; *Shaffer v. State*, 640 P.2d 88, 98 (Wyo.1982).

■■■■ [¶ 31] A total of nineteen photographs were introduced into evidence at the appellant's trial.[7] Five of those photographs were admitted during the testimony of the police department's evidence technician to assist her in describing the crime scene. Prior to admitting the photographs, the district court heard, out of the jury's presence, the State's proffer of relevance and the ap-

---

7. Coincidentally, nineteen photographs out of hundreds taken were admitted in *Barnes,* 858

P.2d at 527.

pellant's objection that the evidence was cumulative and unduly prejudicial. The district court concluded:

> Okay. Well, as to these five photographs, it looks like any objection as to its being cumulative or prejudicial as to 119 is withdrawn. That narrows it down to the four. My observation is that they are from different angles, they are different views of the body. As [the prosecutor] mentions, one of them does show where the firearm was located. One of the photographs, as I see it, would have a better view of the shoulder area, any marks on the arm that there may be or be testified about.
>
> Another of the photographs better shows where the bullet hole that's referred to may have been. So I don't see any problem with this number of photographs of the body at the scene causing a prejudicial effect or being overly cumulative in any way.

[¶ 32] We can find no abuse of discretion in the district court's procedures or decision and we will, therefore, affirm the admission of these five photographs. We turn then to four photographs introduced during the testimony of another of the police department's crime scene technicians. These photographs showed the position of Ms. McCarthy's body on the bed, a pillow and the gun underneath it, a close up of a shell casing, and the blood-soaked sheets showing that the body had been moved. Given these different depictions, the district court found that the photographs were not cumulative and were not unfairly prejudicial, and admitted them over the appellant's objections.

[¶ 33] As with the first group of photographs, the appellant has not met his burden of proving an abuse of discretion in the admission of these photographs. The State provided reasonable justification for their admission, and the district court carefully reviewed the photographs and considered the parties' arguments. We affirm admission of these four photographs.

[¶ 34] Finally, the forensic pathologist who performed the autopsy relied during his testimony upon ten photographs taken during that autopsy. The appellant objected to most of the photographs as being cumulative, unfairly prejudicial, and relevant only to matters that had been conceded. The district court allowed the photographs to be admitted because they helped the witness explain his conclusions as to how the injury and death occurred, and that the death was not a suicide, but a staged suicide. We will affirm the district court because it carefully exercised it discretion and admitted the photographs for legitimate purposes. We have previously held that "[r]eversal is required for the admission of a photograph only if the photograph has little or no probative value and is extremely inflammatory or introduced merely to inflame the jury." *Phillips v. State*, 835 P.2d 1062, 1071 (Wyo.1992) (*citing Shaffer*, 640 P.2d at 97). That does not describe the present case.

### Cumulative Error

[¶ 35] Where, as here, there is no underlying error, a claim of cumulative error must fail. *Springfield v. State*, 860 P.2d 435, 453 (Wyo.1993) (*quoting Young v. State*, 849 P.2d 754, 767 (Wyo.1993)).

### Life Imprisonment Without Parole

[¶ 36] The defendant was sentenced to life imprisonment without parole under Wyo. Stat. Ann. § 6–2–101(c), which reads as follows:

> A person convicted of murder in the first degree in a case in which the state seeks the death penalty shall be sentenced in accordance with the provisions of W.S. 6–2–102. In all other cases, including any case in which the state has determined not to seek the death penalty at any stage of the proceeding, the judge shall determine the sentence of life imprisonment without parole or life imprisonment taking into consideration any negotiated plea agreement and any evidence relevant to a determination of sentence which the court deems to have probative value.

[¶ 37] The appellant contends on appeal, although he did not raise the issue in the district court, that the absence of guidelines in Wyo. Stat. Ann. § 6–2–101(c) leads to the arbitrary imposition of life imprisonment without parole sentences, in violation of the

due process clauses of both the federal and state constitutions.[8] In addition, he alleges that the statute violates Wyo. Const. art. 1, § 7, which forbids "arbitrary power over the lives, liberty and property of freemen[.]"

[¶ 38] This issue comes to us very nearly exactly as it did in *Kenyon,* 2004 WY 100, ¶ 12, 96 P.3d at 1022, where we refused to consider the matter because it was not raised below. We will continue to adhere to the ruling of that case:

> Kenyon concedes that he raises the issues of guidelines and notice for the first time on appeal but contends that these due process protections are of such a fundamental nature that the Court should take cognizance. In a non-capital sentencing context, when our review demonstrates that the sentencing judge has met the due process standards stated above, an argument that the manner in which an additional non-capital penalty has been applied is not so fundamental in nature that we will address the statute's constitutionality when there has been a failure to raise the issues before the sentencing court and preserve them for our review.

*Id.; see also Statezny v. State,* 2001 WY 22, ¶ 11, 18 P.3d 641, 644 (Wyo.2001). That being the law, we will not further consider the appellant's argument that Wyo. Stat. Ann. § 6–2–101(c) is unconstitutional.[9]

### Delay in Docketing the Appeal

■ [¶ 39] The appellant was tried in January 2002 and sentenced in May 2002. His Notice of Appeal was filed in the district court on May 17, 2002. On the same date, the appellant designated as the record on appeal "the transcript of all court records," and sent a letter to the official court reporter asking for preparation of "all pre-trial proceedings, pre-trial motions, changes of plea hearing, trial, and the sentencing hearing."

On May 22, 2002, the official court reporter certified completion of the requested transcripts, with the exception of one from the July 3, 2001, scheduling conference, which conference had been covered by another court reporter. Attached to the certification was a copy of a letter to the substitute court reporter seeking that transcript.

[¶ 40] The next item in the district court file concerning transcripts is a copy of a January 26, 2004, letter from defense counsel to the substitute court reporter confirming the latter's completion of the transcript from the scheduling conference, as well as a transcript from a May 30, 2002, post-trial hearing. Following that letter in the district court file is the appellant's February 17, 2004, motion for order to show cause why the substitute court reporter should not be found in contempt of court for failing to produce the missing transcripts. That motion was scheduled for hearing on March 19, 2004, but the hearing was continued due to defense counsel's unavailability on that date. The transcript from the scheduling conference was filed on March 22, 2004. On April 8, 2004, the clerk of the district court sent a letter to the official court reporter, enclosing the stenographic notes from the May 30, 2002, post-trial hearing. The transcript from the post-trial motion hearing was filed on April 27, 2004, and on the same date the clerk of the district court certified that the record was complete for purposes of appeal. The appeal was docketed in this Court on April 29, 2004.[10]

■ [¶ 41] The appellant contends that the "inordinate delay" in docketing his appeal deprived him of his due process right to a speedy appeal. In *Daniel v. State,* 2003 WY 132, ¶¶ 43–44, 78 P.3d 205, 218–19 (Wyo. 2003), *cert. denied,* 540 U.S. 1205, 124 S.Ct. 1476, 158 L.Ed.2d 127 (2004), we set forth in

---

8. Amendments 5 and 14 to the United States Constitution and Article 1, § 6 of the Wyoming Constitution.

9. The "notice" issue referred to in the quotation from *Kenyon* was Kenyon's allegation that the State did not give him notice that it would be seeking the penalty of life imprisonment without parole until just before sentencing. That separate issue was not raised in this appeal.

10. Pursuant to W.R.A.P. 6.01, this Court acquires jurisdiction over the appeal when the case is docketed, and docketing does not occur until the clerk of the district court certifies completion of the record. A briefing schedule is determined after the case is docketed.

detail the process we will follow in reviewing such allegations:

> To determine whether an inordinate delay denies due process, most courts have adopted a modified version of the test formulated in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), analogizing to the violation of speedy trial rights. *Harris [v. Champion* ], 15 F.3d [1538] at 1558–59 [ (10th Cir.1994) ]; *Rheuark [v. Shaw* ], 628 F.2d [297] at 303 [ (5th Cir.1980) ]; *Allen v. State,* 686 N.E.2d 760, 783 (Ind.1997). The four-prong test examines the length of the delay, the reason for the delay, the defendant's diligence in pursuing the right to appeal, and the prejudice to the defendant. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192; *Coe v. Thurman,* 922 F.2d 528, 531–32 (9th Cir.1990); *Rheuark,* 628 F.2d at 303 n. 8. The length of the delay acts as a triggering mechanism, meaning that unless the delay is unreasonable under the circumstances, there is no necessity to inquire further. *Doggett v. United States,* 505 U.S. 647, 651–52, 112 S.Ct. 2686, 2690–91, 120 L.Ed.2d 520 (1992); *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. In extreme circumstances, an inordinate delay may give rise to a presumption of prejudice. *Doggett,* 505 U.S. at 655–57, 112 S.Ct. at 2692–93 (cited in [*United States v.*] *Smith,* 94 F.3d [204] at 209 [ (6th Cir.1996) ]).

> . . .

> . . . The fourth *Barker* factor, prejudice, is to be assessed in light of the interests that the right to a speedy disposition of an appeal is intended to protect. These interests are: (1) preventing oppressive incarceration pending appeal; (2) minimizing anxiety and concern of a convicted person awaiting the outcome of an appeal; and (3) limiting the possibility that the grounds for appeal or defenses in case of reversal and retrial might be impaired. *Harris,* 15 F.3d at 1559; *Rheuark,* 628 F.2d at 303 n. 8.

[¶ 42] The appellant contends that the length of the delay in this case—two years to docket the appeal and nearly three years to resolve it—is, like the equivalent delay in *Daniel,* presumptively excessive, thereby necessitating inquiry into the remaining *Barker* factors. *See Daniel,* 2003 WY 132, ¶ 46, 78 P.3d at 219 and *Harris v. Champion,* 15 F.3d 1538, 1556 (10th Cir.1994). With respect to the second *Barker* factor, the appellant asserts that court reporter failures are attributable to the State. *See Coe v. Thurman,* 922 F.2d 528, 531 (9th Cir.1990) and *State v. Moore,* 87 N.M. 412, 534 P.2d 1124, 1125–26 (1975). As to the third *Barker* factor, the appellant contends that he diligently pursued his right to an appeal by filing a timely notice of appeal and by not authorizing any extensions of time for filing the delinquent transcripts. Finally, as to the fourth *Barker* factor—prejudice—the appellant's only factual allegations are, first, that the uncharged misconduct evidence that was admitted at trial will now be even more remote in time if there is a retrial, and, second, that he suffered from the "oppressiveness of incarceration" during the delay.

[¶ 43] Having reviewed all of what the record reveals that transpired in regard to the delay in docketing this appeal, we conclude that the appellant's right to the due process of law has not been abridged. Even if we assume that the first and second *Barker* factors have been met because the delay in this case was unreasonable and because the delay was the State's fault, we are unable to find that the appellant has met his burden of proving the last two factors.[11] The record simply does not show due diligence by the appellant. W.R.A.P. 2.06 allows court reporters sixty days from the date the notice of appeal was filed to file the transcripts that were ordered for the appeal. The notice of appeal in this case was filed on May 17, 2002, meaning the transcripts were due July 17, 2002. The transcripts were not filed by that date, yet the appellant *did nothing until Jan-*

11. That assumption may go too far. While we know that the appellate delay was occasioned by the court reporter's lateness in producing two minor transcripts, we do not know the reasons for that lateness. Neutral reasons for delay are not weighted as heavily against the State as are deliberate attempts to delay, and innocent causes for delay may not factor against the State at all. *Berry v. State,* 2004 WY 81, ¶ 36, 93 P.3d 222, 232 (Wyo.2004) (*quoting Wehr v. State,* 841 P.2d 104, 112–13 (Wyo.1992)).

uary 26, 2004—over eighteen months later. Filing a timely notice of appeal does not equal due diligence in pursuing that appeal in the face of delay. While due diligence is certainly not the only factor to be considered, an appellant may not sit on his hands for eighteen months and then complain that nothing has been done.

[¶ 44] The fourth *Barker* factor that must be proved by an appellant is prejudice. As mentioned above, the appellant's first allegation of prejudice is that the State's uncharged misconduct evidence will now be even more remote in time in the event of a retrial. The most obvious problem with that contention is that, inasmuch as there will not be a retrial, there can be no such prejudice. Beyond that, however, we note that even if this case were remanded for another trial, that trial would no doubt take place within such time that the uncharged misconduct would still be well within the time periods that this Court has previously found as being not too remote. Furthermore, the appellant has simply lumped together all of the uncharged misconduct evidence and has given no detailed analysis of particular facts or witnesses that likely would become problematic. Bald assertions are not evidence.

[¶ 45] The appellant next identifies the "oppressiveness of incarceration" as prejudice he has suffered as a result of the delay in this appeal. That statement is contained in his appellate brief, which was, of course, written by counsel. Unfortunately, there is simply nothing factual in the record to support the allegation. Perhaps we can assume that all incarceration is oppressive, but we have not been shown how the appellant's incarceration in this situation is so oppressive as to violate his right to the due process of law. Furthermore, his jury conviction has been affirmed on appeal, meaning that he was not wrongly incarcerated during the delay. *See Daniel,* 2003 WY 132, ¶ 49, 78 P.3d at 220 and *Harris,* 15 F.3d at 1564–65.

[¶ 46] We affirm.